# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

SHAWNDALE CHILCOAT,

Defendant.

Criminal No.  22-cr-299 (CKK)

## GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S
## MOTION FOR RELEASE FROM CUSTODY

The United States, through undersigned counsel, files this response to defendant Shawndale Chilcoat's Motion For Release From Custody, ECF No. 83; *see also* ECF No. 81 (co-defendant Donald Chilcoat's motion for release).[1] The United States opposes the defendant's motion and respectfully urges the Court to deny the motion.

### I.      Factual Background

####    A.   *The Attack on the United States Capitol on January 6, 2021*

After the November 3, 2020 presidential election, on January 6, 2021, a joint session of the United States Congress convened at the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election. *See* Affidavit in Support of Criminal Complaint, ECF No. 1. The joint session began at approximately 1:00 p.m., with then–Vice President Mike Pence presiding. *Id.* By 1:30 p.m., the United States House of Representatives and the United States Senate adjourned to separate chambers within the Capitol to resolve an objection raised in the joint

---

[1] On December 22, 2023, undersigned counsel filed a motion for an extension of time of one day to file the present response. At the time of the filing, undersigned counsel had not yet received the defendants' position on consent for that request. Since that filing, counsel for both defendants indicated their consent to the one-day extension request.

session. *Id.* Vice President Pence continued to preside in the Senate chamber. *Id.*

As the House and Senate proceedings took place, a large crowd of protestors gathered outside the Capitol. *Id.* "[T]emporary and permanent barricades were in place around the exterior of the . . . building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside." *Id.* Shortly after 2:00 p.m., a violent mob of rioters "forced entry" into the Capitol and mayhem broke out inside the building, putting an hours-long halt to the electoral vote count while elected representatives, congressional staff, and members of the press hid from the mob. *Id.* The joint session, and thus the constitutional ritual of confirming the results of the 2020 Presidential Election, "was effectively suspended until shortly after 8:00 p.m." *Id.*

### B.   Shawndale and Donald Chilcoat's Criminal Conduct

The government hereby proffers that Shawndale and Donald Chilcoat traveled to Washington, D.C. from Celina, Ohio to attend the former president's "Stop the Steal" rally. After the rally, the defendants marched to the Capitol grounds. After entering Capitol grounds that were restricted from public access, the defendants made their way to the Lower West Terrace. As they marched towards the Capitol, bike racks, snow fencing, and "AREA CLOSED" signs scattered the ground; chemical irritant filled the air; and loud dispersal orders emitted towards the crowd. The defendants used their cell phones to record videos and take photos of the ensuing chaos.

The defendants climbed up a staircase through construction scaffolding after rioters surged past a police line. The defendants made it to the Northwest Courtyard near the Senate Wing Door and Parliamentarian's Door. Other rioters were actively committing destructive actions – smashing windows and a nearby door. Shawndale Chilcoat recorded a video encouraging the rioters by saying, for example, "Wooo, yeah! Break them all!"

When the defendants were on the Upper West Terrace, Shawndale Chilcoat recorded a selfie-style video saying, "I'm right at the top of the congress . . . we're going to show them how they need to vote today!"



Another rioter smashed through the window of the Parliamentarian's Door and released the door – opening it for the flood of rioters in the nearby Courtyard, including Shawndale and Donald Chilcoat, to enter.

The defendants entered the building through the Parliamentarian's Door.





A line of police officers attempted to prevent the wave of rioters from progressing farther into the building, but the mob quickly overran them. Shawndale Chilcoat posted a video on social media showing the officers directly in front of her in this hallway.



After the crowd overran the police lines, they marched down the Brumidi Corridor and ascended stairs to the second floor. The Vice President of the United States was emergency evacuated using this same staircase not long before.



When the defendants reached the top of the stairs, they turned the corner and entered the

floor of the Senate Chamber – where members of Congress had been present to certify the results of the presidential election prior to the emergency evacuation.



The defendants took photos of themselves on the Senate Floor, as rioters around them celebrated the success of breaching the chamber.

 

Eventually, the defendants exited the Capitol building.

After January 6, Shawndale continued to post on social media about her experience on January 6. She said, for example, ". . . We were just trying to stop them from certifying the votes and didn't know they were already gone. . . ." and "This should be a warning to congress, just try it on the 20th and u wont have to worry about bidens day not having anyone show up!" Shawndale Chilcoat posted on Facebook that it was not "antifa" who broke the windows and stormed Congress – it was her, and she "couldn't be more proud."

## II.    Procedural Background

On August 10, 2021, the government filed a criminal complaint against the defendants. ECF No. 1. The defendants were indicted on September 9, 2022. ECF No. 20. Both defendants pleaded "not guilty" and were released on personal recognizance. Minute Order (9/26/2022).

During a status hearing on December 9, 2022, Shawndale Chilcoat objected to the

jurisdiction of the Court, and demanded that the Court provide proof of jurisdiction. Minute Order (12/9/2022). The Court ordered the defendant to file any such objections by December 16, 2022. The defendant filed three separate filings. The Court accepted all three filings, in addition to another filing from both defendants, indicating that Donald Chilcoat was also a signatory to the previously filed motion. ECF No. 40. The government responded on January 3, 2023. ECF No. 42. The Court construed the filing as a motion to dismiss and denied the motion in a written memorandum opinion. ECF No. 44. The Court found that it had jurisdiction.

After the Court denied the defendants' motion, the defendants indicated that they wanted to proceed *pro se* and stopped communicating with counsel. The Court scheduled *Faretta* hearings for both defendants. Prior to the hearings, the defendants notified the Court that they would continue with their counsel. Minute Order (2/2/2023).

In July 2023, the government requested that the Court set a trial date, but the defendants both expressed a desire to delay the trial to deal with family issues. Minute Order (7/28/2023). The Court accommodated the defendants and permitted the parties more than a month to submit a proposed pretrial scheduling order, with trial to be set at a later date. *Id.* The defendants filed a proposed order requesting a trial no earlier than June 2024. ECF No. 65. The Court ordered a status conference.

The defendant filed a *pro se* submission, expressing concern that the scheduled hearing would be held over video conference. Minute Order (9/1/2023). In light of the filing, the Court ordered the hearing be held in person. The defendants failed to appear for the hearing – either in person or by zoom – on September 5, 2023. *See* Minute Order (9/5/2023).  Counsel for each defendant indicated a failure to make contact with the defendants.

The Court issued a bench warrant but held it in abeyance for forty-eight hours to provide

the defendants an opportunity to appear. Minute Order (9/5/2023). The bench warrants were mailed to the defendants' address. Donald Chilcoat signed for the delivery of the bench warrant. Minute Order (10/5/2023). After delivery of the bench warrant, neither defendant came into contact with the Court or counsel.

The Court ordered another status conference to allow the defendants another opportunity to appear. The Court mailed the notice of the status conference to the defendants' residence.

On October 5, 2023, the defendants again did not appear at the status conference. Minute Order (10/5/2023). Donald Chilcoat then "cut off and removed his ankle bracelet for location monitoring." Minute Order (10/6/2023); ECF No. 77. Both defendants evaded communication with the Pretrial Services Agency (PSA). Both defendants failed to communicate with their counsel. Both defendants failed to appear before this Court. And both defendants had been non-compliant with their conditions of release since early September.

On October 11, 2023, the FBI apprehended the defendants. ECF No. 80. The FBI arrested Donald Chilcoat at his residence. Shawndale Chilcoat learned of the arrest and drove to the local sheriff's department.[2] The sheriff's department contacted the FBI and the FBI arrested Shawndale Chilcoat.

On October 12, 2023, the defendants appeared before a magistrate judge in the United States District Court for the Northern District of Ohio. On the government's motion, the magistrate judge ordered both defendants detained. *See* Case Nos. 23-mj-5424 (Shawndale); 23-mj-5423

---

[2] As this Court has recognized, the defendants' prior filings appear to rest on the "sovereign citizen" ideology. ECF No. 44 at 6. Part of the "sovereign citizen" ideology is a belief that the county sheriff is the most powerful law enforcement officer in the country, with authority superior to that of any federal official. Following the FBI's arrest of Shawndale Chilcoat in the present case, Shawndale Chilcoat filed a $25 million lawsuit against Mercer County Sheriff Jeff Grey, alleging that she had been "trafficked" and Sheriff Grey negligently permitted it. *See Shawndale Chilcoat v. Jeff Grey*, Case No. 3:23-cv-14 (N.D. Ohio).

(Donald). The magistrate judge ordered the U.S. Marshal Service to transport the defendants to the District of Columbia. *Id.* at ECF Nos. 3.

The defendant now moves to be released from custody. ECF No. 83 (Shawndale Chilcoat), *see also* ECF No. 81 (Donald Chilcoat). In support, the defendant contends that – despite refusing to submit to the jurisdiction to the Court and violating her release conditions by failing to appear (twice) – she should be released on their word that they will comply with their release conditions.

The Court should deny these requests.

### III.    **Argument**

Under 18 U.S.C. § 3145(b), a district judge in the prosecuting district may review an order from a magistrate judge in the district of arrest, on motion by the defendant.[3] *E.g.*, *United States v. Vega*, 438 F.3d 610, 615 (10th Cir. 2003).

Title 18 U.S.C. § 3148 provides that sanctions for violation of a release condition include revocation of release, an order of detention, and prosecution for contempt of court. Revocation of release and detention are required if the reviewing judicial officer:

(1) finds that there is . . .

    (A) probable cause to believe that the person has committed a . . . crime while on release; or

    (B) clear and convincing evidence that the person has violated any other condition of release; and

(2)

    (A) based on the factors set forth in section 3142(g) of this title, there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community; or

    (B) the person is unlikely to abide by any condition or combination of conditions of release.

---

[3] Neither defendant cites the statutory bases upon which they filed their motions for release. ECF Nos. 81, 83.

First, under 18 U.S.C. 3148(b)(1)(B), the defendant and her co-defendant violated their conditions of release by failing to appear. *See* ECF Nos. 75, 76; Minute Order (9/5/2023); Minute Order (10/5/2023); *see also* Minute Order (10/6/2023) (explaining Donald Chilcoat cut off and removed his ankle bracelet for location monitoring). Moreover, the defendants failed to appear even after being provided notice that the Court issued bench warrants for their arrests.

Second, under 18 U.S.C. 3148(b)(2)(B), the defendant is unlikely to abide by any condition or combination of conditions of release. *See United States v. Stamper*, Case No. 7:23-009-DCR, 2023 WL 8530016, at *2 (E.D. Ken. Dec. 8, 2023) ("[Section] 3142(b)(2)(A) is written in the disjunctive, and the Court may determine that detention is appropriate based solely on the fact that the defendant is unlikely to abide by the conditions of release.").

Since September 2023, both defendants have taken concerted and drastic efforts to evade the Court and comply with conditions of release. They have refused to appear for hearings; ignored and/or failed to communicate with their counsel; failed to communicate with pretrial services; failed to communicate with the Court; failed to communicate with PSA; for Donald, cut off his ankle bracelet; and for Shawndale, fled to the county sheriff's office. The defendant's actions are consistent with the pattern of behavior since the pendency of this case – refusing to acknowledge the jurisdiction or authority of this Court. The defendants had ample opportunity to comply with conditions of release during the 33 days when their bench warrants were active. Nothing would prevent the defendant (or her co-defendant) from making similar decisions today, if placed on conditions of release. *See also* ECF Nos. 75, 76 (PSA recommending removal from supervision due to non-compliance).

Finally, and alternatively, under 18 U.S.C. 3148(b)(2)(A), based on a consideration of the

factors set forth in 3142(g), there is no condition or combination of conditions of release that will assure that the defendant will not flee. The factors under section 3142(g) are as follows: (1) "the nature and the circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(l)-(4). These factors weigh in favor of detention.

A.    *The Nature and Circumstances of the Offenses Weigh in Favor of Detention*

The nature and circumstances of the defendant's January 6 conduct, supporting the charged offenses, weigh heavily in favor of detention.  Like all rioters on January 6, the defendant was a member of a thousand-strong mob that attacked the Capitol and succeeded in halting the operation of the United States Congress.  Notably, that is precisely the outcome that the defendant intended.

The defendants entered and remained on the Capitol grounds and sought to stop, delay, and hinder Congress's certification of the Electoral College vote. The defendants approached the Capitol building from the West side – marching through a continuous and violent melee. To reach the upper terrace near entrances to the Capitol, the defendants climbed through construction scaffolding to reach an access point to the Capitol building, Shawndale Chilcoat declared that they were going to stop Congress, and the defendants cheered on the destruction of the Capitol building prior to entering. The defendants entered the Capitol building after a nearby rioter violently breached the doors. The defendants approached a police line and, with the strength of the crowd around them, overran the police line. Rioters yelled "WHOSE HOUSE? OUR HOUSE!" as they stormed passed the officers. The defendants proceeded directly to the Senate Floor where members of Congress had emergency evacuated not long before. Although these defendants did not engage in violence, the defendants entered the building and quickly proceeded directly to the Senate

Chamber – where not long before, Congress had been convened to fulfill their constitutional obligations.

For those reasons, the nature and circumstances of the charged offenses strongly support a finding that no conditions of release will assure the defendant will not flee. Additionally, a defendant who demonstrates such contempt from the rule of law cannot reasonably assure future court appearances.

B.      *The Weight of the Evidence Weighs in Favor of Detention*

The weight of the evidence against the defendant and her co-defendant is overwhelming and weighs strongly in favor of detention. The defendant's criminal conduct is captured on many different videos from multiple angles. The defendant can be viewed on surveillance footage from both inside and outside the Capitol, as well as numerous third-party videos. In these videos, her face is fully visible. The defendant memorialized her crimes via photograph and video, and uploaded many of those photos and videos to social media. The defendant also made numerous posts on social media that detailed her actions and intent on January 6.

C.      *The Defendant's History and Characteristics Weigh in Favor of Detention*

The defendant's history and characteristics also weigh in favor of detention. When arrested by the FBI in August 2022, the defendant was combative and verbally abusive toward law enforcement officers. She refused to comply with officer commands. She threatened the officers that next time they arrested her, she would make it more difficult.

The defendant has not maintained steady employment, nor has she kept PSA apprised of her employment activity. At the time of the most recent arrest, the FBI became aware of new employment that was unknown by PSA.

Since September 2023, the defendant has a history of refusing to comply with the orders

of this Court. The defendant has made various forms of "sovereign citizen" arguments since the pendency of the case and has consistently maintained that she is not subject to the jurisdiction or authority of the Court. The defendant doubled down on these views when she violated her release conditions and refused to appear before the Court – on two separate occasions. The defendant was notified that the Court issued bench warrants for the arrests of the defendants, yet she continued to refuse to comply. The defendant's husband Donald Chilcoat, who lives with Shawndale Chilcoat, cut off his ankle bracelet to avoid detection by PSA.

On October 11, 2023, when the defendants learned of the FBI's apprehension efforts, both defendants called 911. Donald Chilcoat falsely reported that the FBI was shooting at him, and Shawndale Chilcoat requested to speak to the sheriff to prevent her arrest. The defendant then fled to the Sheriff's Office, where she was eventually arrested by the FBI.

        *D.*      *Nature and Seriousness of the Danger to the Community*

The defendant willfully entered the Capitol in the midst of the riot – not long after another rioter violently broke through the Parliamentarian's Door. The defendant joined a crowd that quickly overran several lines of officers guarding the building. The defendant boasted about her involvement in the riot after-the-fact, taking credit for being part of the crowd "breaking windows and storming congress."

## <u>CONCLUSION</u>

The defendant's motion for release should be denied, and the defendant should be detained following violations of her release conditions under 18 U.S.C. § 3148(b)(1)(A) and (b)(2)(A) or (b)(2)(B).

                                              Respectfully Submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

*/s/ Ashley Akers*
ASHLEY AKERS
Trial Attorney (Detailed)
MO Bar No. 69601
Ashley.akers@usdoj.gov
(202) 353-0521