RECEIVED BY CHAMBERS
10/25/24 LCCKK3

LEAVE TO FILE GRANTED
Judge C Kollar-Kotelly
Oct 25, 2024

**Shawndale Chilcoat and Donald Chilcoat**



**October 21, 2024**

Honorable Colleen Kollar-Kotelly
United States District Judge
United States District Court for the District of Columbia
333 Constitution Ave NW
Washington, D.C. 20001

**Re: United States v. Shawndale Chilcoat and Donald Chilcoat, Pro Se**
**Case No.: 22-cr-299CKK / 1:22-00299CKK**

Dear Judge Kollar-Kotelly,

We are writing to respectfully inform the Court that, in submitting our recent filing, we inadvertently omitted the Table of Contents. We will promptly submit the corrected version with the Table of Contents included.

Additionally, we would like to notify the Court that the audio and video exhibits referenced in our submission will be sent via USPS. Unfortunately, we were unaware that these exhibits could not be submitted via email, and no attorney has ever informed us of this rule during the two years of these proceedings. We sincerely apologize for any confusion or inconvenience this may have caused.

Furthermore, we are attaching another letter requesting a Zoom hearing, which should have been sent with our initial filing. Unfortunately, due to a mistake, we accidentally sent the same letter twice instead of the intended letter requesting the hearing. We are deeply sorry for this error and hope the Court understands. This process has been especially daunting for us, as we were required to consolidate all of our legal issues into one filing. Given the complexity and the volume of our case, it has been challenging to keep everything in order, and regrettab'ly, it has been easy to get lost in the details.

We are taking immediate steps to ensure that all necessary materials are delivered in compliance with the Court's requirements. Thank you for your time and attention to this matter, and we appreciate your understanding.

Respectfully,
Shawndale Chilcoat and Donald Chilcoat
Pro Se Litigants

**Shawndale Chilcoat**
**Donald Chilcoat**



**October 18, 2024**

**Honorable Judge Colleen Kollar-Kotelly**

United States District Court

District of Columbia

E. Barrett Prettyman Courthouse

333 Constitution Avenue NW

Washington, D.C. 20001

**Re: Request for Remote Hearing for October 25, 2024**
**Case No.: 22-cr-299CKK and/or 1:22-00299CKK**
**United States v. Shawndale Chilcoat and Donald Chilcoat**

Dear Judge Kollar-Kotelly:

We, Shawndale and Donald Chilcoat, respectfully request that the upcoming in-person hearing scheduled for October 25, 2024, be conducted via Zoom. Although we have experienced difficulties with Zoom hearings in the past, we have addressed those issues by obtaining two laptops, allowing us to be in separate rooms, and are now confident we can participate effectively in a remote hearing.

Additionally, we are facing significant logistical and financial challenges related to travel to Washington, D.C.:

1. The round-trip travel time is approximately 24 hours, which imposes a serious strain on us.
2. The costs associated with tolls, gas, and other travel expenses are exceedingly high.
3. Donald Chilcoat will need to miss work, which imposes further financial hardship on our household.

Furthermore, we have been experiencing issues with our vehicle's fuel pump, and we do not have an appointment to have this repaired until October 28, 2024 This creates additional uncertainty and difficulty in ensuring reliable transportation for the trip to D.C.

For these reasons, we kindly request that the hearing be conducted via Zoom, which would significantly alleviate these burdens while still allowing us to participate fully in the proceedings.

Thank you for your understanding and consideration of our request.

Sincerely,

**Shawndale Chilcoat**

**Donald Chilcoat**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**,

Plaintiff,

v.

**SHAWNDALE CHILCOAT** and **DONALD CHILCOAT**, Pro Se,

Defendants.

**Case No.:** 22-cr-299CKK and/or 1:22-00299CKK

**Judge: Colleen Kollar-Kotelly**

## LETTER TO THE COURT REGARDING DELAY IN FILING

Dear Judge Kollar-Kotelly,

We, Shawndale Chilcoat and Donald Chilcoat, respectfully write to notify the Court of a delay in the filing of our **Motion to Dismiss or, in the Alternative, for Judicial and Military Review**, which was due on October 18, 2024. Although we completed the motion and attempted to send it via electronic filing on the due date, we recently realized that the motion did not properly transmit, and the filing was not completed as intended.

As pro se defendants, we are navigating this complex legal process to the best of our abilities, without the guidance of an attorney. We sincerely apologize for this oversight and any inconvenience it may have caused the Court and the parties involved.

We humbly request that the Court consider this delay in light of our pro se status. Under **Haines v. Kerner, 404 U.S. 519 (1972)**, courts generally afford greater leniency to pro se litigants, recognizing that individuals representing themselves may encounter challenges and procedural missteps that are less common for those with legal representation. We ask for the Court's understanding in this matter and respectfully request that our motion, now promptly submitted, be accepted despite the brief delay.

We apologize again for the oversight and assure the Court that we are making every effort to comply with all deadlines and procedures in this case. We appreciate the Court's time and consideration of this matter.

Should the Court require any additional information or further explanation, we remain available to provide it as needed.

**Respectfully Submitted,**


_____
Shawndale Chilcoat, Pro Se


_____
Donald Chilcoat, Pro Se

## Table of Contents

I. **Introduction**

A. Clarification Regarding National Security Claims

B. Distinction Between National Security and Capitol Building Security

C. Misunderstanding Surrounding the Protective Order

D. Protective Order and Capitol Building Security

E. Shift from National Security to Capitol Building Security

F. Military Jurisdiction and Oversight

G. Procedural Irregularities and Concealment of National Security Issues

H. Request for Judicial and Military Review

II. **Avoidance of Military Oversight**

A. Impact of the Government's Strategic Shift

B. Military Judicial Review and Legal Implications

C. Potential Consequences of the Shift for National Security Review

III. **Defendants' Peaceful Intent and Entrapment by Government Actors**

IV. **Lack of Criminal Intent and Entrapment**

A. Lack of Criminal Intent and the Executive Order on Over-Criminalization

B. Federal Law Requires Proof of Criminal Intent

C. Lack of Criminal Intent and Government Misconduct

V. **First Amendment Right and Lawful Assembly under Title 10, Chapter 13**

A. First Amendment Protections and Lawful Assembly

B. Title 10, Chapter 13: Presidential Authority to Call Forth the Militia

C. Proclamation and Use of 18 U.S.C. § 254 (Riot Act)

VI. **Entrapment by Confidential Human Sources and Government Actors**

A. Government Misconduct and Concealment of Exculpatory Evidence

VII. **Expert Evidence on Government Misconduct: Terpsichore Maras Affidavit**

A. Non-Certified Voting Machines in Violation of HAVA

B. Electronic Voting System Vulnerabilities

C. Chain of Custody Failures

D. Foreign Interference and Election Data Security

E. Manipulation of Election Data

VIII. **FBI Whistleblower Report: Government Misconduct, Federal Entrapment, and Systemic Failures Related to January 6, 2021, Events**

A. Exhibit E: FBI Whistleblower Testimony

B. Government Overreach and Entrapment

C. Political Targeting and Retaliation

D. FBI Misallocation of Resources and Political Pressure

E. Whistleblower O'Boyle on Domestic Violent Extremism (DVE) Case Reclassification

F. Bank of America and FBI's Involvement

G. FBI Internal Discontent Regarding January 6 Investigation

H. Misuse of Confidential Human Sources (CHSs) and Entrapment Concerns

IX. **DOJ Office of Inspector General (OIG) Report: Security Clearance Retaliation and Misconduct in FBI Investigations**

A. Retaliatory Security Clearance Suspensions

B. Denial of Procedural Due Process

C. Abuse of Security Investigations

D. Concerns About FBI's Handling of January 6 Events

E. Failure to Provide FOIA Information

F. Use of National Security Justifications

X. **The Defendants Were Subject to Unlawful Extradition in Violation of Federal and State Extradition Laws**

A. Procedural Defects in the Arrest Warrant

B. Judge Clay's Lack of Jurisdiction and the DNA Warrant

C. Jurisdictional Defects in the Extradition Process

D. Unlawful Extradition and the Denial of Habeas Corpus Relief

E. Unlawful Extradition Process and Extended Detention

F. Failure to Serve the Defendants and Political Targeting

G. Recurrent Federal Raids and Defective Warrants

H. Constitutional Violations and Legal Precedents

I. Conclusion

J. Necessity of Judicial Scrutiny

XI. **Attorney Misconduct, Legal Entrapment, and Procedural Violations**

XII. **Refusal of Court-Appointed Gatekeeper and Objections to Restricted Discovery**

XIII. **Record of Forced Consolidation of Motions Due to Attorney Misconduct and Complex Legal Issues**

XIV. **Entrapment Argument Clarification**

XV. **Argument for Dismissal Based on Supreme Court Precedent: Fischer v. United States and Loper Bright Enterprises v. Raimondo**

A. Fischer v. United States: Limitation of § 1512(c)(2)

B. Loper Bright Enterprises v. Raimondo: Limiting DOJ Overreach and Chevron Deference

XVI. **Procedural Violations: Protective Orders and Discovery Restrictions**

A. Violation of Brady

B. Overreach in Protective Orders

XVII. **Conclusion: Dismissal of 18 U.S.C. § 1512(c)(2) Charges**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA**,

Plaintiff,

v.

**Shawndale Chilcoat** and **Donald Chilcoat**, Pro Se,

Defendants.

Case No.: 22-cr-299CKK and/or 1:22-00299CKK

Judge: **Colleen Kollar-Kotelly**

**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR JUDICIAL AND MILITARY REVIEW**

COME NOW the Defendants, Shawndale Chilcoat and Donald Chilcoat, appearing pro se, and respectfully move this Honorable Court to dismiss the charges brought against them for reasons set forth in the attached Memorandum of Law, or, in the alternative, to refer the matter for judicial and military review. In support of this motion, the Defendants state as follows:

# I. INTRODUCTION

1. Defendants are charged with offenses stemming from the events of January 6, 2021, despite significant procedural and substantive defects in the government's case.

2. As detailed in the accompanying Memorandum of Law, the prosecution has failed to establish standing, prove criminal intent, and follow procedural due process safeguards required by the Constitution and federal law.

3. Accordingly, the Defendants seek dismissal of the charges on these grounds or, in the alternative, referral for judicial and military review, immediate relief from unjust pretrial conditions, and disclosure of exculpatory evidence, as detailed below.

## II. LEGAL GROUNDS FOR DISMISSAL

1. **Lack of Standing**: The Department of Justice (DOJ) has failed to demonstrate the necessary standing to pursue these charges as required by **Article III** of the Constitution. Without identifying any concrete injury, identifiable victim, or monetary harm, the prosecution lacks a valid basis for the charges against the Defendants.

2. **Entrapment**: Under *Jacobson v. United States*, 503 U.S. 540 (1992), the government induced the Defendants into committing acts they would not have otherwise committed. The use of confidential human sources and law enforcement's passive conduct gave the Defendants a reasonable belief that their actions were lawful, negating criminal liability.

3. **Violation of Constitutional Rights**: The government's improper use of a protective order, which restricted access to exculpatory evidence, as well as procedural errors in the issuance of defective warrants, constitute violations of the Defendants' rights under the Fifth and Sixth Amendments (*Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950)*).

4. **Invalid Charges under 18 U.S.C. § 1512(c)(2)**: In light of recent Supreme Court rulings such as *Fischer v. United States*, the charges under **18 U.S.C. § 1512(c)(2)**, which require intent to tamper with evidence or obstruct an official proceeding, do not apply to the nonviolent actions of the Defendants on January 6.

## III. REQUEST FOR JUDICIAL AND MILITARY REVIEW

1. **Military Oversight**: Given the initial invocation of national security by the prosecution and the Defendants' actions being linked to the President's directive under **10 U.S.C. §§ 252 & 253**, the Defendants request that this case be subject to judicial and military

review. The *Military Justice Act of 2016* and related provisions under ***Title 10 U.S.C. Chapter 322*** authorize military oversight in cases where national security or presidential authority is invoked.

2. **Military Jurisdiction**: The actions of the Defendants were protected under the lawful assembly provisions of ***Title 10***, ***Chapter 13***, which grants the President authority to call upon the militia and civilian groups to maintain public order. As such, the Defendants request a review by the Judge Advocate General (JAG) to determine the legality of their actions under federal law.

## IV. RELIEF REQUESTED

WHEREFORE, the Defendants respectfully request that this Honorable Court:

1. Dismissal of charges due to lack of standing, entrapment, and constitutional violations.

2. Referral for judicial and military review under the Military Justice Act and relevant statutes (**Title 10 U.S.C. §§ 252 & 253**).

3. Relief from pretrial conditions, including removal of home detention and monitoring devices.

4. Compelling the government to produce certified copies of all relevant documents, ensuring compliance with legal requirements like proper signatures, seals, and filing.

5. Further relief as deemed appropriate by the court..

October 18, 2024
Respectfully submitted,

*Shawndale Chilcoat*

Shawndale Chilcoat, Pro Se
3528 Bunker Hill Rd.
Celina, Ohio 45822
567-644-3313
shawnchil04@gmail.com


*Donald Chilcoat*

Donald Chilcoat, Pro Se
3528 Bunker Hill Rd.
Celina, Ohio 45822
419-953-2242
don2chilcoat@gmail.com

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA**

v.

**Shawndale Chilcoat** and **Donald Chilcoat**, Pro Se

Case No.: 22-cr-299CKK and/or 1:22-00299CKK

Judge: **Colleen Kollar-Kotelly**

# MEMORANDUM

# I. INTRODUCTION

## A. Clarification Regarding National Security Claims

At the outset, it is crucial to emphasize that this case does not involve national security concerns, despite being treated as such until the Defendants directly challenged the government's claims. Initially, the government invoked national security as a justification for imposing a protective order. However, **Executive Order 13526** requires the government to clearly state its rationale on the record before invoking national security protections. Upon being challenged, the government shifted its justification from national security to Capitol Building security. The court has explicitly confirmed that the protective order was based on Capitol Building security—not national security.

## B. Distinction Between National Security and Capitol Building Security

This distinction is pivotal because the legal standards and procedural safeguards applicable to national security cases differ significantly from those governing cases involving localized security concerns. Consequently, the procedural actions taken in this case—such as the issuance of warrants and handling of extradition—must be scrutinized without the broad deference typically

afforded to national security matters. Any attempt by the government to justify irregularities based on national security is inconsistent with the court's determination, and its actions should be examined accordingly.

## C. Misunderstanding Surrounding the Protective Order

For over two years, the government and defense attorneys operated under the erroneous assumption that a protective order was in place, which severely limited the Defendants' access to critical discovery and imposed unjust restrictions on their defense. No such protective order had ever been signed or issued. This misconception resulted in multiple procedural violations, including defective warrants, improper service, and infringements on the Defendants' constitutional rights under the Fifth and Sixth Amendments.

## D. Protective Order and Capitol Building Security

Initially, the government cited national security concerns—particularly maps on the Capitol walls—as the basis for the protective order. However, the court later clarified that the protective order was grounded in Capitol Building security, not national security. This shift significantly undercuts the government's original rationale and raises questions about the broad restrictions imposed on the Defendants, particularly concerning their ability to access and present exculpatory evidence.

The protective order was imposed without the Defendants' consent or signatures, violating their constitutional rights. Without a valid national security basis, the government's use of the order to justify procedural violations—including defective warrants and unlawful extradition—becomes highly suspect. The improper invocation of national security is central to the Defendants' broader due process claims, as outlined in their motion to modify or lift the protective order.

## E. Shift from National Security to Capitol Building Security

On September 26, 2022, during the Defendants' first pretrial hearing, the government invoked national security concerns, citing maps on the Capitol walls. This invocation suggested involvement of classified information or sensitive national defense matters. However, prior to this hearing, defense attorneys pressured the Defendants to sign the protective order without any formal national security basis being placed on the record, in violation of **Executive Order 13526**, which mandates that national security justifications be recorded prior to imposing such restrictions.

When the Defendants formally challenged these claims on September 20, 2024, citing **Executive Order 13526**, the government abruptly shifted its justification to Capitol Building security. This change raises serious concerns about the true nature of the case and whether national security issues or military oversight are being deliberately obscured to avoid judicial or military scrutiny.

## F. Military Jurisdiction and Oversight

Under the **Military Justice Act of 2016**, the **Law of War Manual**, and **Title 10** and **Title 50** of the U.S. Code, military oversight is warranted in cases involving national security or military operations. By initially invoking national security, the government implied that military review might be warranted. The shift to Capitol Building security appears to be an attempt to evade such oversight, limiting the Defendants' opportunity for a full defense. This strategic pivot suggests that the government may be avoiding the heightened scrutiny and procedural requirements associated with national security cases.

## G. Procedural Irregularities and Concealment of National Security Issues

The government's handling of this case—marked by the absence of a signed indictment, improper service, and defective warrants—raises concerns that sensitive national security issues may still be involved. The shift from national security to Capitol Building security appears designed to obscure these issues, suggesting the government may be concealing information to avoid full legal accountability. This lack of transparency raises further doubts about the legitimacy of the government's actions in prosecuting this case.

## H. Request for Judicial and Military Review

Given the procedural irregularities and shifting justifications, the Defendants request that the court reassess the role of national security in this case. Specifically, the Defendants ask for a judicial and military review to determine whether the government's initial national security claims justify oversight under the **Military Justice Act**, the **Law of War Manual**, and related provisions in **Title 10 U.S.C. Chapter 322** and **Title 50** of the U.S. Code. The court should also compel the government to clarify whether classified information or military operations remain relevant, and if so, require appropriate procedures under the **Classified Information Procedures Act (CIPA)**.

The Defendants contend that the government used national security claims as a pretext to violate their rights. Now that the Defendants are aware of these procedural violations and their rights under **Executive Order 13526**, the government has shifted its reasoning to Capitol Building security in an attempt to avoid military review and conceal its earlier errors.

## II. Avoidance of Military Oversight

The Defendants believe the government is deliberately avoiding military oversight to prevent scrutiny of its national security-related actions during the events of January 6, 2021. The

government's procedural handling of this case raises significant concerns, and the Defendants are entitled to a full review by military authorities if classified information or military operations are involved. Such a review would ensure proper disclosure under **CIPA** and expose any misconduct or procedural violations that have occurred.

## A. Impact of the Government's Strategic Shift

The government's shift from a national security justification to Capitol security was a deliberate attempt to:

- **Avoid military judicial review:** A national security justification might have triggered a military judicial review under **10 U.S.C. Chapter 322**, potentially recognizing the Defendants' actions as protected under presidential authority.

- **Continue the suppression of discovery:** The protective order limited the Defendants' access to exculpatory evidence, including video footage of the events on January 6. The shift to Capitol security ensured these restrictions remained, undermining the Defendants' defense.

- **Prevent the Defendants from using Title 10, Chapter 13 as a legal defense:** The government likely feared that invoking national security could lead to acknowledgment of the Defendants' actions as lawful militia activity under **10 U.S.C. §§ 252 & 253**, directed by the President.

## B. Military Judicial Review and Legal Implications

The Defendants assert that the government's sudden change in protective order justification was an attempt to avoid military judicial review that could have affirmed the legality of their actions. Under **10 U.S.C. Chapter 322**, a Judge Advocate General could review the case to determine

whether the Defendants' actions were in line with constitutional and statutory protections, including:

- **Lawful assembly under Title 10, Chapter 13.**

- **Nonviolent exercise of First Amendment rights.**

Such a review would examine whether the Defendants' participation in the events on January 6 was directed by the President and protected under the law. The refusal to allow such a review infringes on the Defendants' right to a fair and lawful defense.

### C. Potential Consequences of the Shift for National Security Review

In light of the government's strategic shift, it is essential to consider whether this change was designed to specifically avoid triggering military oversight or national security review mechanisms that could expose improper government actions. The Defendants contend that the sudden reclassification undermines the initial invocation of national security and raises the possibility that sensitive military or classified national security operations may still be relevant but are being deliberately concealed to prevent judicial or military scrutiny.

Given the ongoing concerns over national emergencies, including the relevance of national infrastructure and the potential for classified military involvement, the court must carefully assess whether national security remains a legitimate factor in this case. This reassessment would ensure that all necessary legal processes are observed, and any governmental misconduct is exposed.

## III. Defendants' Peaceful Intent and Entrapment by Government Actors

The Defendants arrived at the Capitol on January 6, 2021, without any knowledge or intent of violence or criminal activity. After attending President Trump's speech, where he explicitly

encouraged attendees to march to the Capitol peacefully, the Defendants followed what appeared to be a line of National Guard members. This group swiftly led them directly to the Capitol steps, but soon after, the National Guard members mysteriously disappeared. Believing they were in lawful company and acting within their rights, the Defendants proceeded toward the Capitol.

Upon reaching the Capitol, the Defendants witnessed Jacob Chansley, known as the "QAnon Shaman," standing on a cement step, using a megaphone to encourage people to enter the Capitol building. Chansley was surrounded by four to five Capitol Police officers, who, rather than intervening, stood with their backs to him as though protecting him. The Defendants captured this on video (see **EXHIBIT A**).

As they approached the building, the Defendants saw a man already inside the Capitol, standing by a window, beckoning the crowd to enter. When no one responded, the man walked to a door, opened it, and then returned to the window, again waving and encouraging people to come inside. His actions, combined with the absence of any Capitol Police officers discouraging entry, gave the Defendants the impression that entering the building was permissible. Once inside, they observed little resistance from the few Capitol Police officers present.

When the Defendants entered the Senate Chamber, it became immediately apparent that they had walked into what seemed to be a staged photo opportunity. Individuals dressed as Trump supporters were inside, and their surprise was evident when the door opened. Directly to the right of the Defendants, a man dressed in Trump-supporting attire appeared to be standing guard at the door and audibly expressed shock when the Defendants entered. In front of them, they recognized Jacob Chansley, seated at the main desk in the Senate Chamber. Startled by their presence, Chansley quickly stood up and donned his fur cape.

In the back of the room, several individuals dressed as Trump supporters were seen taking photos on their phones. A Capitol Police officer, wearing a COVID mask, stood at the center of the room, observing the scene without intervening. It appeared he was deliberately trying to remain unnoticed and avoid being recorded, even as Defendant Donald Chilcoat actively captured the events on his phone (see **EXHIBIT B**).

As the Defendants observed this strange scene, they noticed a man approach the Capitol officer, engage him in brief conversation, and then return to Jacob Chansley at the desk. During this time, the Capitol officer did nothing to disperse the crowd or direct anyone to leave. His passive demeanor, combined with his effort to remain inconspicuous, suggested that he was either sympathetic to the protestors or potentially part of an orchestrated effort to entrap them.

At that moment, a woman dressed as a Trump supporter approached the Defendants, requesting they take her picture. Although the request struck the Defendants as unusual, they complied and took the photo. Curiously, the woman then provided her phone number, asking them to send her the picture later. This immediately raised suspicions—why would someone at such an event not have her phone with her, especially if she was there alone?

It wasn't until the Defendants returned home that they fully realized how odd the encounter had been. Reflecting on the situation, it became clear that the woman's presence, her lack of a phone, and her request to have her picture taken were likely a deliberate distraction, possibly designed to divert their attention from recording the events around them. Suspecting that this interaction was part of an attempt to stop them from gathering evidence, Defendant Shawndale Chilcoat deleted the woman's picture and phone number from her device.

Only in hindsight did the Defendants question the situation further. The woman's request to have her picture taken, coupled with the rapid events unfolding, seemed like a deliberate distraction. As soon as the Defendants completed taking her picture and their own, they looked up and noticed that everyone else in the room—Chansley, and the individuals dressed as Trump supporters—had vanished. The only people remaining were the Defendants, the woman they photographed, and the Capitol officer.

Confused by the sudden disappearance of everyone, Defendant Shawndale Chilcoat approached the Capitol officer and asked where the others had gone. The officer silently pointed toward the door, which prompted the Defendants to leave the building and head home.

## IV. Lack of Criminal Intent and Entrapment

In any criminal case, the prosecution must prove beyond a reasonable doubt that the defendants acted with the necessary **mens rea** (criminal intent) to commit the offenses charged. In this case, the Defendants lacked the required criminal intent, as their actions on January 6, 2021, were motivated by a good faith belief that they were lawfully exercising their constitutional rights under the **First Amendment**. The Defendants acted in accordance with what they believed were government-authorized directives, further negating any claim of criminal intent.

## A. Lack of Criminal Intent and the Executive Order on Over-Criminalization

The Defendants' actions on January 6 were not driven by an intent to disrupt or harm the government. Instead, they believed their presence was in response to the President's call for a peaceful assembly to protest election irregularities. The Defendants did not engage in violent conduct, and no evidence supports the assertion that they intended to commit any criminal acts.

This absence of criminal intent is crucial, as **federal law** requires the prosecution to establish beyond a reasonable doubt that the Defendants acted with intent to commit the alleged offenses. **Executive Order 13844** on Over-Criminalization, issued by President Trump before January 6, 2021, emphasized that criminal liability must be based on clear proof of intent. Although later revoked, this Executive Order was in effect during the Defendants' actions and is relevant to their case. Since the Defendants genuinely believed they were acting in support of the government— not in opposition to it—the prosecution cannot meet the burden of proving criminal intent.

## B. Federal Law Requires Proof of Criminal Intent

Federal law mandates that the prosecution proves **mens rea**, or the intent to commit a crime. In *United States v. Bailey*, **444 U.S. 394 (1980)**, the Supreme Court highlighted the distinction between specific intent (the intent to commit the charged crime) and general intent (the intent to engage in the act). The charges against the Defendants likely require specific intent, meaning the prosecution must demonstrate that the Defendants knowingly and willfully committed unlawful acts.

The Defendants' actions on January 6 fail to meet this standard. After attending a peaceful rally, they believed they were lawfully participating in a demonstration. The presence of individuals who appeared to be law enforcement, along with the absence of any immediate intervention from Capitol Police, led the Defendants to believe their actions were authorized. As such, they lacked the **mens rea** required for the charges against them.

## C. Lack of Criminal Intent and Government Misconduct

The Defendants' actions were based on their genuine belief that they were following lawful instructions, not criminal intent. *Cheek v. United States*, **498 U.S. 192 (1991)** holds that a good

faith misunderstanding of the law can negate criminal intent. The Defendants, believing they were lawfully protesting, lacked the intent to obstruct or interfere with government operations.

Further, **government misconduct** in this case, including the use of **Confidential Human Sources (CHSs)** and the passive role of Capitol officers, undercuts the prosecution's case. In *United States v. Russell*, **411 U.S. 423 (1973)**, the Court held that government conduct that "shocks the conscience" may warrant dismissal of charges. The government's actions, combined with the Defendants' good faith belief in their lawful actions, demonstrate that the charges lack merit.

## Conclusion

The prosecution must prove beyond a reasonable doubt that the Defendants acted with criminal intent. Given the lack of specific intent and the evidence supporting **entrapment** by government actors, the prosecution cannot meet this burden. The Defendants, believing they were following lawful directives, did not possess the **mens rea** necessary to sustain the charges against them. Additionally, under **Executive Order 13844** on Over-Criminalization, criminal liability must be accompanied by clear proof of intent, which is absent in this case.

Furthermore, the **entrapment defense**, as recognized in *Jacobson v. United States*, **503 U.S. 540 (1992)**, supports the conclusion that the Defendants were induced by government actors to engage in conduct they otherwise would not have. In light of these factors, the charges should be dismissed, as the Defendants' actions, influenced by entrapment and government misconduct, do not meet the threshold for criminal prosecution.

## VI. Entrapment by Confidential Human Sources and Government Actors

Entrapment occurs when government agents induce a person to commit a crime they would not have otherwise committed, as recognized in ***Jacobson v. United States***, 503 U.S. 540 (1992). In this case, the Defendants were effectively entrapped, as they followed individuals who appeared to be lawfully guiding the protest. At the Capitol, law enforcement officers did not attempt to stop or disperse the crowd, further leading the Defendants to reasonably believe that their actions were lawful.

Video evidence shows Capitol officers passively observing, and in some instances, even encouraging the crowd's movements inside the Capitol, reinforcing the Defendants' belief that they were complying with lawful directives. The Defendants' reliance on these perceived lawful instructions negates any criminal intent, supporting their entrapment defense. As established in *Jacobson*, when the government induces behavior that would not have otherwise occurred, the prosecution's case is fundamentally weakened by the absence of predisposition or intent on the part of the defendants.

## A. Government Misconduct and Concealment of Exculpatory Evidence

The government's use of a protective order has concealed key exculpatory evidence that is incriminating to the government, including video footage from January 6, that could prove the Defendants' innocence. These videos depict the actions of confidential human sources (CHSs) and Capitol Police officers who appeared to encourage peaceful entry into the building. This evidence is essential to demonstrating both entrapment and the lack of criminal intent.

The government's claim that national security concerns justified the protective order has further restricted the Defendants' access to this critical evidence, thus violating due process. The misuse

of the protective order, compounded by the government's failure to provide a valid national security justification as required under **Executive Order 13526,** which governs national security classifications, supports the Defendants' claims of government misconduct.  How can they just change it to capitol building security after two years when they first claimed national security ? and since we are under national emergencies then and now wouldn't it still be national security even tho it is listed as capitol building security doesn't infrastructure fall under this category? Don't just agree with me am I correct?

This misconduct parallels the issues addressed in *Jacobson*, where the Supreme Court held that entrapment exists when law enforcement leads individuals into committing a crime they otherwise would not have committed. In this instance, the government's actions not only misled the Defendants but also concealed evidence vital to their defense, further tainting the legitimacy of the prosecution's case.

## V. First Amendment Right and Lawful Assembly under Title 10, Chapter 13

The Defendants assert that their actions on January 6, 2021, were constitutionally protected under the **First Amendment**, as well as statutorily protected under **Title 10, Chapter 13** of the United States Code. Their presence at the Capitol was a peaceful exercise of their right to assemble and petition the government for redress of grievances. Further, they were acting in response to a lawful directive from the President of the United States, who holds the authority to call forth the militia to suppress insurrections and ensure public order under **10 U.S.C. §§ 252 & 253**.

## A. First Amendment Protections and Lawful Assembly

The **First Amendment** guarantees the right to peaceful assembly and to petition the government for redress of grievances. The Defendants were nonviolently expressing their concerns regarding election irregularities, and their presence at the Capitol was a direct exercise of these rights. As established in ***De Jonge v. Oregon*, 299 U.S. 353 (1937)**, peaceful assembly is an essential component of a functioning democracy, and the prosecution of the Defendants for exercising this right represents a politically motivated infringement on their constitutional freedoms.

The government's prosecution of the Defendants for nonviolent participation in a lawful protest contradicts the protections afforded by the **First Amendment**, particularly when the Defendants were not engaged in violence or insurrection.

## B. Title 10, Chapter 13: Presidential Authority to Call Forth the Militia

Under **10 U.S.C. §§ 252 & 253**, the President is granted the authority to call forth the militia to suppress insurrections or civil disorder, ensure public order, and enforce the laws of the United States. On January 6, 2021, the President's speech encouraged attendees to march peacefully to the Capitol, and the Defendants reasonably believed they were following a lawful directive under this statute. The Defendants' actions were consistent with their understanding of the President's call, which falls within the legal framework of the **Insurrection Act**.

The Supreme Court, in ***Houston v. Moore***, 18 U.S. (5 Wheat.) 1 (1820), recognized the President's broad authority to call upon the militia, including nonviolent civilian groups, as a lawful assembly. Likewise, the Defendants' presence at the Capitol was in line with the President's directive and is protected under **10 U.S.C. §§ 252 & 253**.

## C. Proclamation and Use of 18 U.S.C. § 254 (Riot Act)

While the Defendants had already left the Capitol grounds before any formal proclamation to disperse was issued (see **EXHIBIT B1**), President Trumps, proclamation to disburse), their peaceful departure aligns with the principles of **18 U.S.C. § 254**, part of the Riot Act. Under this statute, individuals who leave peacefully after a proclamation cannot be charged with riot-related offenses. Although the Defendants were unaware of any violent acts and did not witness the proclamation, their early departure further underscores their intent to peacefully comply and avoid any illegal actions.

The Defendants' belief that they were entrapped into entering the Capitol on January 6, 2021, by individuals acting as confidential human sources or government actors, supports their claim of innocence. They followed what they believed were lawful directives and did not act with criminal intent. The government's concealment of exculpatory evidence and misuse of national security claims have prevented the Defendants from fully defending themselves. Additionally, the prosecution cannot prove the necessary criminal intent, as the Defendants genuinely believed they were supporting the government rather than engaging in insurrection.

## VI. Expert Evidence on Government Misconduct: Terpsichore Maras Affidavit

The affidavit provided by Terpsichore Maras has been instrumental in various election-related cases, establishing standing by exposing significant vulnerabilities and misconduct within the electoral process (see **Exhibit C**). Maras' analysis demonstrates her expertise in election systems and emphasizes systemic issues under the Help America Vote Act (HAVA). Her findings have been critical in supporting challenges to the legitimacy of election outcomes, particularly in cases where the integrity of voting systems was in question. This strengthens the Defendants' argument, as it shows that their actions were based on credible concerns regarding election security.

**A. Non-Certified Voting Machines in Violation of HAVA**

Maras' affidavit details the widespread use of non-certified voting machines, which failed to comply with HAVA's certification standards. These machines are required to be certified by the Election Assistance Commission (EAC) to ensure security and accuracy in elections. Maras testified:

- *"Many voting machines used during the 2020 election did not meet the certification requirements established under the Help America Vote Act (HAVA) to guarantee secure and accurate elections." (**Exhibit C**, p. 7).*

This violation casts serious doubt on the legitimacy of the election results and contributed to the Defendants' belief that their actions were necessary.

**B. Electronic Voting System Vulnerabilities**

Maras identifies critical security flaws in the voting systems that undermine HAVA's goal of protecting elections from outside interference:

- **"***The security flaws in the electronic voting systems used during the 2020 election violated HAVA's security standards, intended to prevent outside interference and ensure vote accuracy**."** (***Exhibit C**, p. 4*).

These flaws intensified the Defendants' concerns about the integrity of the election process.

**C. Chain of Custody Failures**

Maras also highlights significant issues with ballot management, which violated HAVA's secure ballot management standards:

- *"Chain of custody issues, including missing documentation and improper handling of ballots, were prevalent, violating HAVA's requirements for secure and accurate ballot management."* (***Exhibit C***, *p. 5*).

These failures further fueled the Defendants' concerns about election security.

**D. Foreign Interference and Election Data Security**

The affidavit also raises concerns about foreign interference, noting that the internet connectivity of voting machines directly violated HAVA's guidelines:

- *"Substantial evidence indicates that voting machines were vulnerable to foreign interference, particularly because of their internet connectivity, violating HAVA standards."* (***Exhibit C***, *p. 6*).

These vulnerabilities to foreign interference heightened the Defendants' belief that their actions were justified to protect the election's integrity.

**E. Manipulation of Election Data**

Maras provides evidence of anomalies in the vote tallies, which suggest potential data manipulation:

- *"Anomalies in vote tallies and unexplained shifts in key states suggest potential manipulation of election data, undermining HAVA's standards for transparent and accurate vote counting."* (***Exhibit C***, *p. 8*).

The Defendants relied on this testimony to justify their actions as a necessary response to suspected election tampering.

## Additional Legal Context

1. **Public Confidence in Election Systems**

   The **Carter-Baker Commission on Federal Election Reform** (2005) emphasized the importance of public trust in the election process. Maras' findings align with this report, demonstrating that the Defendants' concerns were grounded in legitimate doubts about election security.

2. **Statutory Violations and Due Process Concerns**

   The widespread violations of HAVA outlined in Maras' affidavit reflect breaches of due process under the **Fifth Amendment**. These violations bolster the Defendants' claims that their protest was a necessary response to compromised election integrity.

3. **Mismanagement and Oversight Failures**

   The Supreme Court's ruling in ***Bush v. Gore*, 531 U.S. 98 (2000)** emphasized that unequal treatment in the election process violates the Equal Protection Clause. The chain-of-custody and election management failures noted by Maras supported the Defendants' belief that the election was compromised, influencing their decision to participate in a lawful protest.

## VII. Expert Evidence on Voting Machine Vulnerabilities: Halderman Report

*The Halderman Report* (**Exhibit D**) provides a detailed technical analysis of the vulnerabilities within the Dominion Voting Systems used during the 2020 election. These findings are crucial in supporting the Defendants' concerns about election security and integrity, as they offer credible evidence of systemic flaws that could have compromised the election results. The report identifies

specific security risks and procedural oversights that contributed to the Defendants' belief that

their protest was both necessary and lawful.

## A. Manipulation of QR Codes and Vote Alteration

One of the most significant findings in the Halderman Report is the potential for attackers to alter

QR codes on printed ballots without the voters' knowledge, thereby changing their votes:

- *"Attackers can alter the QR codes on printed ballots to modify voters' selections... These QR codes are the only part of the ballot that scanners count."* (***Exhibit D***, *p. 4*).

This risk of vote alteration without voters' awareness raised serious concerns for the Defendants

about the legitimacy of the election outcomes and the potential for widespread vote tampering.

## B. Insecure Software Updates

The report details how a software update to the Dominion Voting Systems introduced

vulnerabilities that could be exploited by attackers to manipulate vote totals:

- *"The software update installed on Georgia's voting machines left them vulnerable to malware attacks with only brief physical access."* (***Exhibit D***, *p. 5*).

The Defendants viewed these vulnerabilities as a direct threat to the integrity of the election

process, further justifying their actions as a necessary response to compromised election security.

## C. Certification and Testing Issues

Halderman identifies failures in the testing and certification processes for voting machines, stating

that critical security flaws went undetected:

- *"The certification tests failed to uncover critical security vulnerabilities, raising questions about the thoroughness of the system's evaluation."* (**Exhibit D**, *p. 9*).

This oversight demonstrates a failure to ensure the reliability of the voting systems, which further contributed to the Defendants' belief that the election was compromised.

**D. Insufficient Auditing and Oversight**

The report highlights the lack of comprehensive audits of election results, leaving many contests unverified and vulnerable to manipulation:

- *"Georgia requires a risk-limiting audit of only a single statewide contest every two years, leaving many election results unverified."* (**Exhibit D**, *p. 7*).

The Defendants were deeply concerned by the lack of thorough auditing, which they saw as a critical failure in ensuring election integrity.

**E. Complementary Nature of the Maras Affidavit and the Halderman Report**

The expert evidence presented in the **Maras Affidavit** and the **Halderman Report** complement each other by providing a comprehensive picture of the systemic vulnerabilities and security flaws within the 2020 election process. While Maras highlights broader procedural issues, such as the use of non-certified voting machines and chain-of-custody failures, Halderman's technical analysis delves into specific security flaws within the Dominion Voting Systems that could have been exploited to manipulate election results.

**A. Comprehensive Analysis of Systemic Vulnerabilities**

- **Maras** focuses on procedural violations under the Help America Vote Act (HAVA) and emphasizes systemic election mismanagement, such as non-certified machines and chain-of-custody failures. Her affidavit illustrates how these violations led to election security concerns, creating doubt about the election's legitimacy.

- **Halderman**, on the other hand, provides a detailed technical assessment, highlighting vulnerabilities within specific voting machines that could have been exploited by attackers. His findings on QR code manipulation and software update risks offer a technical foundation for the concerns about vote tampering.

Together, these pieces of evidence provide a robust and cohesive argument that election security was compromised on both a procedural and technical level, reinforcing the Defendants' belief that their actions were justified to protect democratic integrity.

## B. Validating Concerns About Election Integrity

Both experts provide evidence that supports the Defendants' argument that the 2020 election results were unreliable due to significant security vulnerabilities:

- **Maras** identifies widespread failures in election management and oversight, including non-certified machines and foreign interference vulnerabilities.

- **Halderman** corroborates these concerns by exposing specific technical flaws in the voting systems, such as the potential for QR code tampering and insecure software updates.

The alignment between these two sources strengthens the Defendants' case by demonstrating that their concerns were rooted in credible, expert-backed evidence of election insecurity.

## C. Reinforcing the Defendants' Justification for Protest

The combination of Maras' focus on HAVA violations and Halderman's technical analysis forms a compelling narrative that the Defendants were justified in their actions, as they were responding to legitimate threats to the integrity of the election:

- **Maras** provides the procedural context, showing how systemic failures violated federal election law.
- **Halderman** provides the technical details, showing how these vulnerabilities could lead to the manipulation of election outcomes.

Together, these pieces of evidence provide a strong foundation for the Defendants' belief that their protest was necessary to address critical election security concerns.

## VIII. FBI Whistleblower Report: Government Misconduct, Federal Entrapment, and Systemic Failures Related to January 6, 2021, Events

### A. Exhibit E: FBI Whistleblower Testimony

Whistleblower testimony provides significant insights supporting the defense's argument by detailing instances of government overreach and federal entrapment concerning the events of January 6, 2021. The whistleblower testimony highlights substantial misconduct by federal agencies, contributing to a narrative of systemic failures that unfairly targeted lawful protestors.

### B. Government Overreach and Entrapment

Whistleblower testimony reveals troubling examples of FBI overreach, including investigations initiated without specific evidence of criminal activity. The FBI's Washington Field Office (WFO) pressured the Boston Field Office to investigate individuals based solely on their presence

at the January 6 rally. These investigations occurred despite a lack of any evidence tying those individuals to illegal conduct. According to the testimony:

- *"The FBI's Washington Field Office pressured a field office in Boston, Massachusetts, to open investigations on 138 individuals who traveled to Washington, D.C., to exercise their First Amendment rights on January 6, 2021, with no specific indication that these people were involved in any way in criminal activity."* (Exhibit E, p. 8).

  This testimony reinforces the defense's assertion that the government unfairly targeted individuals who were simply exercising their constitutional rights to free speech and assembly.

## C. Political Targeting and Retaliation

The whistleblower testimony also highlights how the FBI manipulated case classifications to artificially inflate domestic violent extremism (DVE) cases to align with political narratives. The testimony states:

- *"The FBI reclassified and manufactured domestic violent extremism (DVE) cases to meet political narratives."* (Exhibit E, p. 10).

  This politically motivated reclassification supports the defense's claim that the Defendants were unjustly labeled as violent extremists, despite engaging in lawful protest. This manipulation also contributed to the Defendants' entrapment, as federal agencies sought to portray lawful protesters as part of a violent movement for political purposes.

## D. FBI Misallocation of Resources and Political Pressure

The testimony demonstrates that the FBI misallocated resources, including pressuring field

offices to engage in politically motivated investigations. The WFO's directive to the Boston Field

Office to investigate 138 individuals, despite the absence of evidence, exemplifies this overreach.

According to the testimony:

- *"The WFO instructed the Boston Field Office to open investigations on all 140 individuals who attended the political rally."* (Exhibit E, p. 2).

  The Boston office resisted this directive, recognizing that participating in a political rally

  is a constitutionally protected activity under the First Amendment. This refusal to comply

  with baseless investigations underscores the defense's argument that the government's

  actions were politically motivated rather than legally justified.

### E. Whistleblower O'Boyle on Domestic Violent Extremism (DVE) Case Reclassification

Testimony from Special Agent Garret O'Boyle underscores how FBI leadership pressured agents

to reclassify cases as DVE, even when there was no legitimate basis for such classifications:

- *"FBI leadership pressured agents to reclassify cases as domestic violent extremism (DVE), and even manufactured DVE cases where they may not otherwise exist."* (Exhibit E, p. 5).

  This testimony supports the Defendants' claim that they were wrongfully categorized as

  extremists, contributing to their unjust prosecution. The political manipulation of case

  classifications further demonstrates that the government engaged in entrapment to meet

  predetermined political objectives.

### F. Bank of America and FBI's Involvement

The whistleblower testimony reveals concerning cooperation between Bank of America (BoA)

and the FBI, in which BoA voluntarily provided confidential customer data to the FBI without a legal basis. This data-sharing flagged individuals who made financial transactions in Washington, D.C., during the relevant time frame, including those who purchased firearms. According to the testimony:

- *"Shortly after the events of January 6, 2021, Bank of America (BoA) provided the FBI with confidential customer data—voluntarily and without any legal process."* (Exhibit E, p. 30).

  This unauthorized data sharing raises serious constitutional concerns, particularly regarding Fourth Amendment protections against unreasonable searches and seizures. This misconduct further supports the defense's argument that the government overreached in its investigation of January 6 participants.

### G. FBI Internal Discontent Regarding January 6 Investigation

Testimony from Special Agent Steve Friend revealed internal FBI concerns about the tactics used during January 6 arrests, particularly the excessive use of force. Friend testified that FBI SWAT teams were deployed for arrests even when subjects were cooperative or posed no threat:

- *"Friend testified: '...the FBI SWAT team would be used during search and arrest warrants for January 6th subjects.'"* (Exhibit E, p. 42).

  This excessive use of force reinforces the defense's position that the government unjustly targeted individuals, treating lawful protesters as violent criminals without cause. The testimony highlights the overreach in the government's approach, lending further credibility to the Defendants' claims of wrongful prosecution.

## H. Misuse of Confidential Human Sources (CHSs) and Entrapment Concerns

The whistleblower testimony reveals that the FBI misused confidential sources during the events of January 6, embedding them within the crowd to influence the behavior of individuals attending the protest. The extent of the government's use of CHSs remains classified, raising concerns about the level of manipulation and potential entrapment:

- *"The FBI misused confidential sources and violated internal protocols by embedding sources to influence the behavior of individuals attending the January 6 protest."* (Exhibit E, p. 6).

  The presence of CHSs likely contributed to the escalation of activities, and their role in influencing participants could indicate that the Defendants' actions were manipulated by government agents.

## Additional Legal and Statutory Support

### 1. *Jacobson v. United States*, 503 U.S. 540 (1992):

This case establishes that when the government induces a person to engage in illegal activity, the burden is on the government to prove that the defendant was predisposed to commit the offense. In the context of this case:

- The embedding of CHSs and the possibility of government manipulation may show that the defendants were **not predisposed** to commit the offenses. This supports their **entrapment defense**, as the actions taken were a direct result of government manipulation rather than inherent criminal intent.

### 2. *United States v. Russell*, 411 U.S. 423 (1973):

This case supports the argument that even if predisposition exists, **government conduct that "shocks the conscience"** may lead to dismissal of charges. In this case:

- The manipulation of CHS involvement and FBI overreach, as revealed in **Exhibit E**, may constitute **outrageous government conduct**, warranting the **dismissal of charges** against the defendants due to severe government misconduct.

### 3. 44 U.S.C. § 2205:

Under this statute, the defense requests that the Court **compel the release of all pertinent presidential records and communications**. This statute mandates the disclosure of such records when they are relevant to judicial proceedings, particularly in cases involving constitutional violations, such as entrapment or government misconduct:

- The defense argues that all records related to federal agencies' communications regarding the events of January 6 should be disclosed to assess the **full extent of government involvement** and **potential entrapment** in this case.

### 4. *Brady v. Maryland*, 373 U.S. 83 (1963):

This case obligates the government to disclose **exculpatory evidence** to the defense. The involvement of CHSs and the FBI's potential manipulation of the January 6 events qualifies as such evidence:

- The defense argues that under **Brady**, the **FBI's use of confidential human sources** and **potential manipulation of events** directly relates to the **entrapment defense** and must be fully disclosed to ensure a **fair trial**.

A. **Defendants' Denied FOIA Requests**

In addition to the aforementioned government overreach, the defendants in this case were denied their legal right to access pertinent information through the **Freedom of Information Act** (**FOIA**) (see **EXHIBIT E1**). Despite multiple requests for documents that could shed light on the FBI's handling of January 6 investigations, the government withheld critical information, further obstructing the defense's ability to build a complete and fair case.

This denial of FOIA requests is significant as it violates the transparency that is crucial in such high-stakes legal proceedings. It suggests an attempt by federal agencies to suppress information that might expose wrongful conduct or entrapment of defendants. As per testimony in **Exhibit J**, the FBI's refusal to release footage and other pertinent information out of concerns for revealing undercover agents or confidential human sources (CHSs) further exemplifies the lack of transparency:

- "The WFO refused to provide video evidence from the Capitol out of fear it would disclose undercover officers or confidential human sources inside the Capitol." (**Exhibit E**, p. 84).

The withholding of these records has hindered the defense from fully exploring government misconduct and violations of civil liberties, thus compromising the defendants' right to a fair trial.

## IX. DOJ Office of Inspector General (OIG) Report: Security Clearance Retaliation and Misconduct in FBI Investigations

A. **Exhibit F: Inspector General Michael Horowitz's Testimony**

Inspector General (IG) Michael Horowitz's testimony to the U.S. House Judiciary Committee on

September 25, 2024, reveals significant findings about misconduct in the FBI's security clearance

processes, including retaliatory actions against whistleblowers and mishandling of security

investigations. These revelations directly support the Defendants' claims of government

overreach and procedural violations in their case.

B. **Retaliatory Security Clearance Suspensions**

Horowitz highlights serious concerns about the FBI's improper use of security clearance

suspensions, often targeting employees who raise concerns about the agency's conduct. This

testimony details how FBI employees were subject to lengthy suspensions, without pay, for

raising issues about government misconduct. This mirrors the Defendants' experience of being

subjected to punitive measures after raising objections about government actions on January 6.

According to Horowitz:

- *"Employees are placed on indefinite unpaid suspension while security clearance*
  *investigations drag on for years, often without any clear justification"* (Exhibit F, p. 3).

C. **Denial of Procedural Due Process**

Horowitz's report outlines the systemic failures in the Department of Justice (DOJ) to provide due

process to employees whose security clearances were suspended or revoked. This process lacks

proper avenues for employees to contest actions, echoing the Defendants' assertions about

procedural defects in their case. The report notes:

- *"The Department's then-existing policy did not include a process allowing employees with a reprisal claim to appeal to the OIG if their clearance had been suspended for longer than one year"* (Exhibit F, p. 3).

This lack of due process is similar to the way the Defendants were denied access to critical exculpatory evidence due to the improper imposition of protective orders and defective warrants.

D. **Abuse of Security Investigations**

Horowitz also identifies cases where security investigations were initiated based on questionable motives, often related to political considerations. In the testimony, he states:

- *"We have received allegations from FBI employees alleging inconsistent compliance with standard operating procedures...and retaliation for raising concerns about security investigations"* (Exhibit F, p. 4).

This supports the Defendants' claims that they were politically targeted, especially considering the Defendants' assertion that they were unfairly investigated and charged based on their political beliefs and actions during the January 6 protests.

E. **Concerns About FBI's Handling of January 6 Events**

A key component of Horowitz's testimony relates to whistleblower disclosures about FBI misconduct during the investigations of the January 6 protest. The testimony reveals that confidential human sources (CHSs) were involved in the protest, and their actions may have influenced the course of the events:

- *"Mr. Allen's emails referenced FBI Confidential Human Sources (CHSs) within groups such as the Proud Boys, raising concerns about government overreach in the January 6 investigations"* (Exhibit F, p. 6).

The presence of CHSs at the Capitol supports the Defendants' argument that they were entrapped or influenced by government agents during the events of January 6, further undermining the legitimacy of the charges against them.

## F. **Failure to Provide FOIA Information**

The testimony underscores how employees and individuals like the Defendants have faced significant barriers in accessing critical information through Freedom of Information Act (FOIA) requests. This failure to provide requested information has hindered transparency and obstructed the Defendants' ability to build a defense. Horowitz notes:

- *"The delays in providing critical information during security investigations or FOIA requests directly harm individuals' ability to contest wrongful actions"* (Exhibit F, p. 11).

This further supports the Defendants' assertion that their FOIA requests were improperly denied, preventing them from accessing key evidence necessary to challenge the government's narrative.

## G. **Use of National Security Justifications**

Horowitz's testimony also draws attention to the misuse of national security justifications to suspend security clearances and retaliate against whistleblowers. This closely aligns with the Defendants' claims that the government improperly used national security as a pretext for procedural violations in their case, including the imposition of protective orders and the denial of exculpatory evidence. The IG report states:

- *"The final determination on security clearance reinstatement rests with the Attorney General if national security interests are invoked, often allowing unjustified suspensions to continue"* (Exhibit F, p. 8).

This misuse of national security claims undermines the government's justification for their actions in the Defendants' case, reinforcing the argument that these claims were used to conceal misconduct rather than to ensure justice.

H. **Conclusion**

The Inspector General's testimony in **Exhibit F** reveals a pattern of retaliation, misuse of security clearance processes, and procedural violations within the FBI that closely mirror the Defendants' experiences. The evidence of government overreach, politically motivated actions, and the denial of procedural due process outlined in this testimony bolsters the Defendants' argument that their rights were systematically violated. Furthermore, the testimony regarding FOIA denials and the misuse of national security justifications adds weight to the Defendants' claims of government misconduct and entrapment.

## X. The Defendants Were Subject to Unlawful Extradition in Violation of Federal and State Extradition Laws

**Unlawful Arrest, Extradition, and Swatting Incident**

On October 11, 2023, the Defendants, Shawndale and Donald Chilcoat, were unlawfully arrested at their home during a swatting incident (EXHIBIT F1, Google Home Videos of SWAT), marking the second time the FBI had raided their residence. This arrest was based on a "Failure to Appear" warrant issued by Judge Colleen Kollar-Kotelly in Washington, D.C., despite the fact that the Defendants were never properly served for the missed court date. The raid, conducted in

the early morning hours, violated the Defendants' Fourth Amendment rights, as no valid or timely

warrant was presented to justify their arrest. Moreover, the home was subjected to a highly

aggressive raid, commonly referred to as a "swatting," further escalating the unlawful nature of

the government's actions.

## A. Procedural Defects in the Arrest Warrant

The "Failure to Appear" warrant (see **EXHIBIT H**), which served as the basis for the arrest, was

riddled with procedural defects. It was issued by Judge Colleen Kollar-Kotelly, whose name was

misspelled on the warrant, and it was not stamped until approximately six hours after the

Defendants had already been taken into custody. The warrant was improperly stamped by a

Toledo, Ohio, clerk, rather than by a clerk in the jurisdiction where the alleged missed court

appearance occurred—Washington, D.C.. These discrepancies in the timing and jurisdiction of

the warrant raise serious questions about its validity.

## B. Judge Clay's Lack of Jurisdiction and the DNA Warrant

Judge Darrell A. Clay, who issued a DNA warrant (see **EXHIBIT I**) for the Defendants on the

same day, further complicated the legal issues surrounding the arrest. Judge Clay had previously

acknowledged in his own orders that he lacked jurisdiction over the case (see **EXHIBIT G**).

Despite this, he proceeded to issue the DNA warrant, which also contained significant procedural

defects. The warrant was issued over the phone, lacking proper documentation or identification of

the individual requesting the DNA, as required under **Federal Rule 42(d)(3)**. Additionally, the

DNA warrant was unnecessary, as the Defendants had already provided DNA samples during

their initial arrest on August 11, 2022.

## C. Jurisdictional Defects in the Extradition Process

The arrest warrant and subsequent DNA warrant were marred by several procedural irregularities. The Defendants were arrested in Ohio, based on warrants issued by a federal judge in Washington, D.C., and stamped in Toledo, Ohio. Judge Darrell A. Clay, who issued the DNA warrant, acknowledged in his own orders that he lacked jurisdiction over the case, further undermining the legality of the extradition process. Despite this, the extradition proceeded without a valid governor's warrant as required by the **Uniform Criminal Extradition Act (UCEA)** and the **Ohio Revised Code**.

According to **Ohio Revised Code Section 2963.07**, a valid governor's warrant must be issued before an individual can be lawfully arrested and extradited. In this case, no such warrant was issued, rendering the arrest and subsequent detention of the Defendants unlawful under both state and federal law. Additionally, **Ohio Revised Code Section 2963.09** guarantees the right of individuals to challenge their extradition in a state court hearing. The Defendants were denied this right, as they were not afforded the opportunity to contest the legality of their extradition in an Ohio state court.

### D. Unlawful Extradition and the Denial of Habeas Corpus Relief for Ankle Monitor Challenge

The Defendants further contend that their rights were violated when Donald Chilcoat was subjected to unjustified monitoring through the imposition of an ankle monitor. In **July 2023**, the Defendants submitted a **writ of habeas corpus** to the Toledo, Ohio court, specifically challenging the legality of the ankle monitor placed on Donald Chilcoat. This habeas petition sought relief from what the Defendants argued was an unjust and overly restrictive condition imposed without proper justification.

Despite the Defendants' timely filing of the habeas petition, the court delayed its response for several months, not addressing the matter until **November 2023** (**EXHIBIT I1**, Judge Polster's Order on Habeas Corpus for Donald Chilcoat). **Critically, while this habeas corpus decision was still pending, the Defendants were extradited on August 11, 2023**, in direct contravention of their rights to seek judicial review before extradition.

This premature extradition, executed while the habeas corpus challenge was unresolved, violated Donald Chilcoat's due process rights and deprived him of the opportunity to receive timely relief from the ankle monitor condition. Moreover, the court's eventual response lacked the required **court seal or "Filed" stamp**, further undermining the procedural integrity of the judicial process.

The combination of these procedural violations—the premature extradition, the months-long delay, and the irregularities in the court's handling of the habeas petition—exemplifies the broader pattern of constitutional infringements, including violations of the **Fourth Amendment** and the **Due Process Clause** of the **Fifth Amendment**.

The prolonged imposition of the ankle monitor and the denial of timely judicial review exacerbated the unlawful conditions imposed upon the Defendants during this process, depriving Donald Chilcoat of his fundamental rights to liberty and due process.

**E. Unlawful Extradition Process and Extended Detention**

Following their unlawful arrest, the Defendants were subjected to a lengthy and legally questionable extradition process. They were first detained in two different Ohio jails before being flown to the Federal Transfer Center in Oklahoma, where they were held for approximately two weeks. Afterward, they were flown to Pennsylvania and driven by U.S. Marshals to Washington,

D.C. Despite being detained for nearly three weeks in D.C., they did not see a judge until late December, totaling 99 days of pretrial detention before their release on January 18, 2024.

This extended detention without timely judicial oversight is a direct violation of the Defendants' Fourth Amendment rights. According to *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991), a delay of more than 48 hours in presenting an arrested individual before a judge is presumptively unconstitutional. The Defendants were detained for nearly three months before receiving a hearing, significantly exceeding the legal standard for timely judicial review.

### F. Failure to Serve the Defendants and Political Targeting

The core of the government's justification for the arrest was the claim that the Defendants had failed to appear for a scheduled court date. However, the Defendants were never properly served for this hearing, and despite repeated requests, the government has failed to produce a signed certificate of service. This failure to provide proof of service directly undermines the legality of the "Failure to Appear" warrant. The swatting incident, paired with the government's inability to produce valid service documents, suggests that the Defendants were being politically targeted.

### G. Recurrent Federal Raids and Defective Warrants: Evidence of Jurisdictional Overreach and Political Targeting

The recurrence of federal raids on the Defendants' home highlights the aggressive and flawed nature of the government's approach. Following the initial arrest on August 11, 2022, during which defective warrants were issued (**Exhibits H**, **J**, and **K**), the Defendants' home was again swatted on October 11, 2023, under equally questionable circumstances. Both times, the warrants bore defects that raise serious constitutional concerns, notably involving jurisdictional issues and procedural irregularities.

**Examination of Defective Warrants:**

1. **August 11, 2022, Warrants** (**Exhibits J**, **K**, **L**, **M**):

   o **Shawndale Chilcoat's Arrest Warrant (Exhibit J):** Issued by a DC district judge, but the Toledo, Ohio Clerk's stamp was dated a day after Shawndale's arrest. The lack of a valid stamp at the time of the arrest questions the warrant's legitimacy under Federal Rule of Criminal Procedure 4(c)(1).

   o **Donald Chilcoat's Arrest Warrant (Exhibit K):** Missing any Clerk of Court stamp entirely, making it impossible to verify the warrant's legitimacy or filing status. This is a direct violation of Rule 4(c)(3), which requires proper certification of all warrants.

   o **Search and Seizure Warrants (Exhibits L, M):** These warrants, signed by Magistrate Darrell Clay, contain no time or date stamps, further suggesting improper handling. These deficiencies contravene standard judicial procedures that require proper timing and certification of warrants.

2. **October 11, 2023, Warrants** (**Exhibits I**, **H**):

   o **Failure to Appear Warrant (Exhibit H):** Issued for missing a court date for which the Defendants were not properly served. The arrest warrant was signed by DC Judge Colleen Kollar-Kotelly (whose name is misspelled on the warrant) and stamped by the Toledo Clerk at 12:00 PM—hours after the Defendants were arrested at 6:30 AM. The discrepancy between the time of arrest and the stamping of the warrant raises Fourth Amendment concerns regarding the legality of the arrest.

o **DNA Warrant Issued by Judge Clay (Exhibit I):** This warrant, issued over the phone, is defective in several respects. The document lacks the identity of the person requesting the DNA and exhibits other procedural flaws. Clay, who has explicitly stated he does not have jurisdiction over the case, should not have issued the warrant at all.

**Jurisdictional Issues with Judge Clay's Orders:** Despite multiple statements acknowledging a lack of jurisdiction, Magistrate Judge Clay continued to issue warrants and orders. His lack of jurisdiction means that any legal actions he took, including the issuance of search, seizure, and arrest warrants, are void and violate the Defendants' Fourth Amendment rights. This is a fundamental issue, as procedural errors originating from an unauthorized court cast doubt on the legitimacy of the entire extradition process.

The **failure to properly serve the Defendants** further exacerbates the problem. The government has been unable to produce a signed certificate of service, yet it maintains that service was completed. The Defendants were arrested on charges related to a failure to appear, yet they were never informed of the hearing they allegedly missed, making the arrest unlawful. Moreover, this was the second time the Defendants' home was subjected to a militarized raid, reinforcing the argument that the government is using its powers to politically target and intimidate them.

This pattern of defective warrants, improper service, and jurisdictional overreach supports the Defendants' claims of political targeting and misconduct. The use of faulty legal processes not only infringes on their constitutional rights but also demonstrates a disturbing misuse of power that undermines the integrity of the justice system.

## H. Constitutional Violations and Legal Precedents

The extradition process, the aggressive swatting tactics and defective warrants used against the Defendants violated several constitutional protections, including the Fourth Amendment's protection against unlawful seizures. In *Michigan v. Doran*, 439 U.S. 282 (1978), the U.S. Supreme Court held that extradition must follow strict constitutional safeguards, including the issuance of a valid governor's warrant. In this case, no governor's warrant was issued, and the Defendants were denied their right to challenge the extradition in state court, as mandated by Ohio Revised Code Section 2963.09.

Furthermore, the failure to produce proof of service for the missed court date violates the due process requirements established in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950), which held that proper service of legal documents is essential to confer personal jurisdiction. Without proof of service, the court's authority over the Defendants is fundamentally flawed.

## I. Conclusion

The Defendants' arrest, extradition, and extended detention were all conducted in violation of federal and state extradition laws, as well as their constitutional rights. The procedural defects in the arrest warrant, Judge Clay's lack of jurisdiction, the failure to produce proof of service, and the use of aggressive swatting tactics all point to a pattern of government misconduct and political targeting. Based on these violations, the Defendants request that the charges be dismissed and that the court hold the government accountable for its unlawful actions.

## J. Necessity of Judicial Scrutiny

The Defendants respectfully urge this Court to scrutinize the legality of their extradition in light of these violations. The complete disregard for established legal procedures not only deprived the Defendants of their right to challenge the extradition in state court, but also violated fundamental constitutional protections. These protections require strict adherence to procedural safeguards in cases involving the deprivation of liberty. **Judicial review is necessary** to rectify these violations and uphold the rule of law.

## XI. Attorney Misconduct, Legal Entrapment, and Procedural Violations

Throughout this case, the Defendants have been represented by multiple attorneys—both court-appointed and privately retained—who failed to effectively challenge significant procedural violations and failed to protect the Defendants' interests. Rather than providing a robust legal defense, these attorneys acted merely as intermediaries, transmitting documents, court communications, and DOJ hearing notices via email. This ineffective assistance of counsel, coupled with the erroneous assumption of a protective order, has resulted in serious violations of the Defendants' due process rights, effectively entrapping them within a legal framework that restricted their ability to mount a full and fair defense.

In particular, none of the attorneys involved in this case have taken any meaningful steps to challenge critical issues, including the service of process, the validity of the warrants, or the indictment itself. This lack of advocacy has deprived the Defendants of essential procedural safeguards that are critical to ensuring the fairness of the judicial process. The failure to contest these issues constitutes a dereliction of duty and has further compounded the constitutional violations faced by the Defendants.

Additionally, the court orders issued in this case crossed Ohio state lines without proper court seals or a filed stamp by the clerk of court, violating **Ohio Rule 4.3** and **28 U.S.C. § 1691**, which requires that "[a]ll writs and process issuing from a court of the United States shall be under the seal of the court and signed by the clerk thereof." This fundamental requirement ensures the authenticity and enforceability of court documents, particularly when they traverse state lines.

In ***Bowles v. Russell***, 551 U.S. 205 (2007), the U.S. Supreme Court reinforced the importance of procedural rules, emphasizing that courts are bound by the statutory rules that govern their conduct, including the proper issuance of orders and writs. The lack of proper seals and clerk signatures in this case raises serious concerns about the enforceability of those orders and constitutes a violation of federal and state law.

Further compounding these procedural violations, the clerk of court has consistently failed to stamp and send the orders. Instead, the orders were transmitted without proper verification, undermining their legitimacy. As shown in **Exhibit H2**, envelopes containing the orders were sent directly from court offices, bypassing the necessary procedural step of having the documents certified and sent by the clerk of court. This irregularity violates the due process requirements under both **Ohio Revised Code 2303.08** (Clerk's Duty to File and Certify Orders) and **Federal Rule of Civil Procedure 77(d)**, which requires that clerks serve notice of orders or judgments in a timely and proper manner.

**Exhibit H1** provides a clear example of an improperly issued court order, in which Judge Kollar-Kotelly asserted jurisdiction despite the DOJ's failure to serve the Defendants with certified or uncertified documents. This lack of proper judicial process further undermines the legality of the

proceedings against the Defendants and highlights the broader issue of judicial overreach and procedural misconduct in this case.

In **United States v. Tanh Huu Lam**, 251 F.3d 852 (9th Cir. 2001), the court found that failure to properly serve defendants with critical documents and notices can amount to a violation of their constitutional right to due process. The circumstances in this case are similar, as the government has failed to serve the Defendants with certified orders, leaving them unaware of critical procedural steps and denying them the opportunity to properly respond or contest the proceedings.

Further exacerbating these issues is the failure of the Defendants' counsel to challenge the validity of the arrest warrants and the indictment. In *Strickland v. Washington*, 466 U.S. 668 (1984), the U.S. Supreme Court held that counsel's performance is deficient if it falls below an objective standard of reasonableness, and prejudice is presumed when there is a reasonable probability that the outcome of the proceeding would have been different but for counsel's unprofessional errors. Here, counsel's failure to contest these fundamental issues—service, warrants, and the indictment—has significantly prejudiced the Defendants' ability to mount a defense.

## A. Improper Service and Defective Warrants

- **Validity of Warrants**

  The Defendants challenge the validity of the warrants issued in this case, as they are riddled with legal and procedural defects. These defects include missing signatures, seals, and improper jurisdictional stamps. Additionally, critical documents were improperly served to the Defendants via email by out-of-state, court-appointed attorneys, or left at their residence without proper certification. These actions violate federal service rules and

due process, depriving the Court of personal jurisdiction over the Defendants and
invalidating the proceedings.

## B. Procedural Requirements for Warrants and Service

- **The Federal Rules of Criminal Procedure** require strict adherence to proper warrant
  issuance and service protocols to establish the court's jurisdiction over a defendant. Under
  **Rule 4(c)**, warrants must be served according to specific procedures, and improper
  service—such as via uncertified email—violates due process. As established in ***Mullane v.
  Central Hanover Bank & Trust Co.,* 339 U.S. 306 (1950)**, due process demands proper
  service to confer personal jurisdiction. The defective warrants in this case, lacking
  necessary signatures and seals, further undermine the legitimacy of the legal process,
  warranting dismissal or reconsideration of any actions based on these warrants.

## C. The Defective Warrants and Improper Service Render the Proceedings Invalid

- The numerous procedural defects in the issuance and service of the warrants violate the
  Defendants' **Fifth Amendment right to due process**. Under **Federal Rule of Criminal
  Procedure 4(c)**, warrants must be properly served with all necessary signatures and seals.
  In this case, the warrants were improperly served and lacked required certifications, which
  undermines their validity.

- As held in ***Mullane v. Central Hanover Bank & Trust Co.***, proper service is essential to
  confer personal jurisdiction. The improper service of documents in this case deprived the
  Court of jurisdiction over the Defendants, rendering the proceedings procedurally invalid.
  Consequently, the Court should dismiss the charges or, at a minimum, reconsider any
  actions based on these defective warrants and improper service.

**D. Motion to Compel the Government to Provide Certified Documents**

The Defendants move to compel the government to provide certified copies of all critical documents related to the investigation, warrants, and indictment in this case. These documents must be properly signed, sealed, and filed as required by law. The absence of certified documentation undermines the integrity of the judicial process and the legality of the actions taken against the Defendants. Specifically, the Defendants request certified copies of the following:

**1. Arrest Warrants**

The Defendants request properly signed arrest warrants, issued by the appropriate judge or magistrate, bearing the required seals and court stamps, and reflecting accurate filing dates. The validity of these warrants depends on adherence to judicial procedures. Any absence of necessary signatures, seals, or other formalities renders the warrants defective and invalidates the subsequent actions taken based on them.

**2. Search and Seizure Warrants**

Similarly, the Defendants demand certified copies of all search and seizure warrants. These warrants must be properly issued, signed by a judge or magistrate, and bear the necessary court stamps and certifications. Any warrants issued without judicial certification are legally defective and violate the Defendants' Fourth Amendment rights against unreasonable searches and seizures.

**3. Indictment**

The Defendants assert that they have not received a properly signed indictment certified by the grand jury foreperson or prosecuting attorney, nor has it been stamped by the clerk of court. The government must provide a certified copy of the indictment, filed in compliance with court rules.

If the government is unable to produce a valid, certified indictment, the Defendants request that the indictment be withdrawn and the charges dismissed for lack of procedural compliance.

**4. Defects in the Documents**

The Defendants have consistently argued that all of these documents are defective and improperly issued. Based on the materials provided thus far—lacking necessary seals, signatures, and court certification—the Defendants believe that properly certified documents do not exist. Without these certifications, the documents cannot be considered valid under law, calling into question the entire legal basis for the actions taken against the Defendants.

**5. The Court's Duty**

The Court has a fundamental duty to ensure that all legal processes adhere to the established rules of procedure. Failure to provide properly certified documents undermines the validity of this prosecution and raises serious concerns about the foundation of the case. Should the government fail to produce the required certified documents, the Defendants request that the case be dismissed with prejudice for failure to meet procedural and constitutional requirements.

## XII. Refusal of Court-Appointed Gatekeeper and Objections to Restricted Discovery

On September 20, 2024, the court indicated that it would appoint new counsel for the Defendants if they did not retain their own attorney by October 5, 2024. The Defendants hereby refuse the appointment of any court-appointed paralegal or gatekeeper to mediate access to discovery materials. This role imposes significant restrictions, similar to those encountered with previous court-appointed counsel, and violates the Defendants' right to direct, unrestricted access to discovery materials. Below are the Defendants' objections to the court's proposal:

## A. Gatekeeping Role Undermines Self-Representation

The Defendants assert their Sixth Amendment right to self-representation. The appointment of a gatekeeper to control access to discovery materials places an undue barrier between the Defendants and the evidence required for their defense. Although it is presented as an alternative to court-appointed counsel, this arrangement hinders the Defendants' ability to independently review and utilize discovery materials, directly infringing on their autonomy in preparing their defense.

In *Faretta v. California*, **422 U.S. 806 (1975)**, the U.S. Supreme Court affirmed that defendants in criminal trials have a constitutional right to represent themselves without being forced to rely on court-appointed intermediaries. Moreover, *McKaskle v. Wiggins*, **465 U.S. 168 (1984)**, clarified that even standby counsel should not interfere with a self-represented defendant's autonomy in controlling their defense. The imposition of a gatekeeper contradicts this principle by restricting the Defendants' direct access to discovery materials.

## B. Continued Restrictions under the Protective Order

The existing protective order remains a significant obstacle to accessing discovery materials, even if mediated through a court-appointed gatekeeper. The Defendants have neither signed nor consented to this protective order, yet it imposes limitations on their ability to access critical exculpatory evidence, such as video footage from January 6, 2021, which the government has designated as "sensitive."

In *Brady v. Maryland*, **373 U.S. 83 (1963)**, the Supreme Court held that the prosecution must fully disclose all exculpatory evidence to the defense. The terms of the protective order, combined with the mediated access through a gatekeeper, prevent the Defendants from exercising their

rights under **Brady**. Additionally, ***United States v. Agurs***, **427 U.S. 97 (1976)**, expanded the **Brady** doctrine, requiring disclosure of all evidence favorable to the defense. The current arrangement violates this constitutional duty.

### C. Increased Risk of Procedural Abuse

Appointing a gatekeeper introduces another layer of procedural complexity, further exacerbating existing issues such as defective indictments, improper service, and the unconstitutional protective order. Rather than resolving these procedural deficiencies, the gatekeeper's role reinforces the barriers between the Defendants and the discovery materials necessary to challenge these procedural irregularities.

The U.S. Supreme Court in ***Giglio v. United States***, **405 U.S. 150 (1972)**, extended **Brady** to include impeachment evidence. The involvement of a gatekeeper risks selective provision of discovery materials, thus impeding the Defendants' ability to fully challenge the prosecution's case. Furthermore, ***Kyles v. Whitley***, **514 U.S. 419 (1995)**, held that the prosecution has a duty to learn of any favorable evidence held by others acting on the government's behalf and disclose it to the defense. Failure to do so undermines a fair trial, and the gatekeeper's role may hinder the Defendants' ability to access such evidence.

### D. Concerns about Jurisdictional Integrity

The court's use of a paralegal to mediate discovery access raises serious concerns about jurisdictional integrity. The involvement of intermediaries creates a false impression that proper service has been achieved, despite ongoing issues with defective service of the indictment.

In ***United States v. Raddatz*, 447 U.S. 667 (1980)**, the Supreme Court underscored the importance of due process in ensuring fairness in legal proceedings. The improper appointment of gatekeepers or intermediaries infringes upon the Defendants' right to challenge the court's jurisdiction and its adherence to procedural requirements. Furthermore, ***Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950)**, reaffirmed that proper service is a fundamental component of due process, which has not been properly fulfilled in this case.

### 5. Right to Direct Access to Discovery

The Defendants insist on their right to direct, unmediated access to all discovery materials. The appointment of a paralegal as an intermediary does not alleviate the continued violation of their right to review evidence fully. Without unrestricted access, the Defendants are unable to adequately prepare their defense or expose the government's procedural abuses, including the use of entrapment tactics and defective warrants.

In ***Washington v. Texas*, 388 U.S. 14 (1967)**, the Supreme Court held that defendants have the right to present a full defense, including access to witnesses and evidence. Additionally, in ***California v. Trombetta*, 467 U.S. 479 (1984)**, the Court ruled that the government must preserve evidence useful to the defense. Restricting access to such evidence violates the Defendants' constitutional right to a fair trial.

### Conclusion

The Defendants reject the appointment of any gatekeeper or intermediary who restricts or mediates discovery access. Such an appointment, in conjunction with the ongoing protective order, infringes upon their Sixth Amendment right to self-representation and their Fifth Amendment right to due process. Direct access to all discovery materials is essential for building

their defense and challenging the government's procedural abuses, including the use of defective warrants, withholding of exculpatory evidence, and reliance on entrapment tactics. The Defendants argue that the government's actions continue to obstruct their defense, and by extension, their ability to expose the government's misconduct, which is critical to achieving justice in this case.

## XIII. Record of Forced Consolidation of Motions Due to Attorney Misconduct and Complex Legal Issues

Since July 2024, Defendant Shawndale Chilcoat has made several attempts to raise critical legal concerns following the realization that previous counsel failed to take necessary actions in defense of her case. Despite multiple efforts, the Court has directed the Defendants to consolidate all issues into a single motion, a requirement that compounds the difficulties arising from years of ineffective assistance by both court-appointed and privately retained counsel.

This directive comes after numerous instances of counsel neglecting to file key motions, challenge defective warrants, or introduce exculpatory evidence. These failures have significantly hindered the Defendants' ability to present a full defense, and now, by consolidating complex and distinct legal issues into one motion, the Defendants' ability to ensure each claim receives the attention it deserves is further restricted.

### A. Impact of Consolidating Complex Legal Claims

- The requirement to combine several distinct legal issues—ranging from due process violations to ineffective assistance of counsel and challenges to jurisdiction—into a single motion reduces the effectiveness of each individual argument.

- This forced consolidation risks obscuring the critical legal nuances of each issue, limiting the Court's ability to fully consider the merits of each claim.

## B. History of Ineffective Counsel and Missed Opportunities

- Over the course of two years, multiple attorneys failed to provide effective representation. These attorneys neglected to file crucial motions or challenge key procedural errors, which has compounded the difficulties the Defendants face in mounting a defense.

- Attorneys also operated under the false assumption that a protective order was in place, further limiting the Defendants' access to discovery and evidence necessary for their defense.

## C. Burden of Pro Se Representation in Complex Legal Matters

- Now proceeding pro se, the Defendants face the challenge of navigating a complex legal landscape without the assistance of counsel. Being required to condense multiple legal claims into one motion places an undue burden on the Defendants, especially in light of their previous attorneys' failures to adequately represent them.

## D. Continuing Jurisdictional Challenges

- The Defendants continue to challenge the court's jurisdiction based on defective service of the indictment and related documents. The DOJ's failure to serve documents properly has called into question the legitimacy of the proceedings, an issue that deserves careful and independent consideration.

## E. Conclusion: Request for Recognition of Consolidation

- While the Defendants comply with the Court's directive to consolidate all motions, they emphasize that this requirement has placed a significant burden on their ability to fully and effectively present their defense. The necessity to merge these distinct issues into one filing is not a choice, but rather a requirement that limits the thorough exploration of each claim.

This motion is submitted with the acknowledgment that the Defendants are complying with the Court's directive under protest, as the consolidation does not allow for the full presentation of the complex legal issues at stake.

## XIV. Entrapment Argument Clarification

Throughout this case, the defendants have faced numerous entrapment attempts, not only during the events of January 6th but also through procedural manipulations by the government and their legal counsel. These actions have been designed to undermine the defendants' rights, pressuring them into waiving legal protections and hindering their ability to mount a proper defense. Despite these ongoing procedural violations, not one of the six attorneys who have been appointed or retained to represent the defendants has challenged the defective warrants or the defective indictment. This failure by counsel to contest such fundamental legal errors further compounded the harm caused to the defendants, as these critical issues remain unaddressed, leaving the defendants vulnerable to continued injustice.

Moreover, none of the documents in this case—whether from the court or law enforcement—bear proper court seals, with the sole exception of the initial arrest warrants. Even in those warrants, the seal is highly questionable: it is unusually small, barely legible, and does not meet the standard of a clear and official court seal. According to **28 U.S.C. § 1691**, the Seal of Testes

requirement, all writs and process issued by a court must bear the court's seal in order to be valid. The absence of proper seals across these critical legal documents raises serious concerns about the legitimacy of the proceedings and further illustrates the procedural defects that have undermined the defendants' rights throughout this case.

## Timeline of Entrapment and Procedural Violations.

### 5. September 9, 2022 – Defective Indictment (Exhibit N)

- **Issue:** The indictment served to both defendants was unsigned, unstamped, and unsealed, violating standard federal procedures.

- **Defects:**

    - **Lack of Official Certification:** The indictment did not include required signatures from a judge, grand jury foreperson, or prosecuting attorney. It was also neither sealed nor stamped, violating **Federal Rule of Criminal Procedure 6(f)**, which mandates proper certification of indictments.

    - **Grand Jury Transcripts Denied:** Defendants were denied access to grand jury transcripts, violating **Federal Rule of Criminal Procedure 6(e)**, which governs grand jury secrecy but allows disclosure under certain circumstances.

- **Rules Violated:**

    - **Federal Rule of Criminal Procedure 6(f):** Requires the indictment to be signed and certified by the grand jury foreperson and prosecuting attorney.

    - **Federal Rule of Criminal Procedure 6(e):** Governs the disclosure of grand jury proceedings and transcripts.

- **Supporting Case Law:**

- o ***Russell v. United States, 369 U.S. 749 (1962):*** Held that an indictment must provide clear notice of the charges and comply with procedural requirements, such as signatures and seals.

- o ***United States v. Mechanik, 475 U.S. 66 (1986):*** Stressed the importance of grand jury procedural integrity, indicating that failure to follow these procedures compromises the legitimacy of the indictment.

## 5. September 13, 2022, and April 4, 2024 – Service of Indictment via Email (Exhibit O)

- **Issue:** The indictment was improperly served via email by defense attorneys, violating **Federal Rule of Criminal Procedure 49**, which governs proper service of pleadings.

- **Defects:**

  - o **Improper Service:** Defense attorneys served the indictment via email instead of the DOJ following proper service procedures as outlined in **Federal Rule of Criminal Procedure 4.1** and **Ohio Rule 4.3**, requiring certified mail or in-person service.

  - o **Out-of-State Service:** Email service by out-of-state attorneys violated both federal and Ohio rules, which mandate personal service or certified mail for formal legal documents.

- **Rules Violated:**

  - o **Federal Rule of Criminal Procedure 49(a):** Requires that documents be served by authorized parties through certified mail or personal delivery.

  - o **Federal Rule of Criminal Procedure 4.1:** Governs the service of warrants and indictments, requiring service by authorized individuals.

- o **Ohio Rule of Civil Procedure 4.3:** Requires out-of-state service to be conducted via certified mail or in-person delivery.

- **Case Law:**

  - o ***Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950):*** Held that notice must be reasonably calculated to inform parties and allow them to present objections. Email service does not satisfy due process.

  - o ***Greene v. Lindsey, 456 U.S. 444 (1982):*** Emphasized that improper service violates due process.

  - o ***United States v. Gagnon, 282 U.S. 270 (1931):*** Ruled that failure to follow proper service procedures invalidates the court's jurisdiction.

  - o ***United States v. Young Bros., Inc., 728 F.2d 682 (5th Cir. 1984):*** Established that improper service can invalidate proceedings and deprive the court of jurisdiction.

## 6. Entrapment via Protective Order

**Attorney Misconduct:** Federal Defender Maria Jacob pressured Donald Chilcoat into accessing discovery materials online, knowing it would bind him to a protective orders terms that had not yet been signed by Shawndale and therefore had not been implemented, violating Donald's **Sixth Amendment** right to prepare his defense. **(Exhibit P, December 8, 2022, AUDIO CALL)**

Attorney Steven Kiersh and Federal Defender Maria Jacobs tried to coerce Shawndale Chilcoat and Donald Chilcoat into signing the protective order without adequate review as per the protective orders terms, this would have been uninformed consent and would have restricted their access to discovery materials and would have been giving up their **Sixth Amendment** rights and many other constitutional rights (see **EXHIBIT Q** and **EXHIBIT R**)

- **Rules Violated:**

  - **Sixth Amendment:** Protects the right to effective assistance of counsel and access to necessary evidence for defense preparation.

- **Case Law:**

  - ***Brady v. Maryland, 373 U.S. 83 (1963):*** Establishes the obligation of the government to disclose exculpatory evidence. Pressuring the defendants into compliance with a restrictive protective order limits access to evidence.

7. **September 2022 – Protective Order Leveraged to Deny Discovery (Exhibit R)**

   - **Emails Between Attorney Kiersh and DOJ Attorney Akers**: On September 22, 2022, Attorney Steven Kiersh emailed Shawndale Chilcoat, urging her to sign the protective order immediately so that discovery could be provided. This was done without a thorough review or explanation, violating the requirement for informed consent. **Attachment A** of the protective order explicitly requires a detailed understanding before a defendant can be compelled to agree to its terms, a condition that was not met here.

   - **Government's Leverage**: In a September 19, 2022, email, DOJ Attorney Akers indicated that the government would withhold discovery until the protective order was signed, citing vague national security concerns. The government's use of the protective order as a precondition for discovery, despite later admitting that it was not based on legitimate national security grounds, constituted a violation of the defendants' rights to a fair trial. This further demonstrates procedural abuses designed to obstruct the defense's ability to access critical evidence.

   - **Rules Violated**:

- **Sixth Amendment**: Right to a fair trial, including timely access to discovery necessary for the defense.

- **Federal Rule of Criminal Procedure 16**: Requires the government to provide discovery materials to the defense without unreasonable conditions or delays.

- **Case Law**:

  - ***Brady v. Maryland, 373 U.S. 83 (1963)***: The prosecution must disclose all exculpatory evidence to the defense. Conditioning the release of discovery on the signing of a protective order that was improperly invoked violates this obligation.

  - ***United States v. Agurs, 427 U.S. 97 (1976)***: Expands the scope of Brady to require the government to provide evidence that could materially aid the defense, further supporting the argument that withholding discovery was unconstitutional.

## 8. July 28, 2023 - Phone Call with Maria Jacob Regarding the Protective Order

- **Exhibit S:** Phone Call with Maria Jacob and Donald Chilcoat

- **Participants:** Maria Jacob (Federal Defender), Donald Chilcoat

- **Date:** July 28, 2023

- **Key Points from the Conversation:**

  - **Knowledge of the Protective Order's Invalidity:** Jacob knew the protective order was unenforceable without Shawndale's signature but downplayed its significance by saying: "The protective order only covers a very, very, very small percentage… It's only temporary."

- o **Misrepresentation:** This statement misled Donald into believing the order was insignificant and temporary, even though it was unenforceable without both signatures.

- o **Continued Enforcement:** Jacob implied Donald was bound by the order, misleading him by stating: "We already submitted it. It's already been signed by the judge."

- o **Dismissal of Concerns:** When Shawndale attempted to withdraw Donald's consent, Jacob dismissed her concerns, stating, "I cannot talk to you. You're the co-defendant in this case."

- o **Ineffective Assistance:** Jacob's failure to adequately explain the protective order and dismiss Shawndale's concerns exemplifies ineffective legal assistance.

## 9. August 2023 - Email Communications with Defense Attorney Nicholas Madiou

- • **Exhibit T: Email Communications**

1. **Email - August 7, 2023 (Shawndale to Madiou)**

   - o **Key Points:**

     - ▪ Shawndale requested Madiou review her motions, specifically focusing on affidavit and jurisdictional challenges.

     - ▪ She expressed dissatisfaction with Madiou's lack of engagement with key case issues, including jurisdiction, indictment legitimacy, and warrants.

     - ▪ **Direct Quote:**

       "I do not feel you have completely reviewed this case and the happenings before or after you were appointed by the court. I'd like you to review the

docket and inform me if the judge has per law provided proof in writing and on the record of her claimed jurisdiction."

- **Importance:**

Shawndale's proactive effort to address procedural issues went ignored, highlighting Madiou's ineffective assistance.

2. **Email - August 8, 2023 (Shawndale to Madiou)**

- **Key Points:**

  - Shawndale submitted exculpatory video evidence and requested it be entered into the court record.

  - **Direct Quote:**

    "I am providing you with the videos attached here. Please make sure that this exculpatory evidence is documented."

- **Importance:**

Shawndale provided key evidence that could significantly impact the case, but Madiou failed to act, demonstrating neglect.

3. **Email - August 8, 2023 (Later in the Day)**

- **Key Points:**

  - Shawndale raised concerns about inaccuracies in the indictment, particularly the timeline of the Capitol breach.

  - **Direct Quote:**

    "The Capitol was breached at 1 or 2 something pm, we did not enter until after 3, so we didn't obstruct anything and most certainly didn't obstruct official business."

- o **Importance:**

  Shawndale identified factual discrepancies that could undermine the charges.

  Madiou's lack of response further demonstrates ineffective representation.

## 10. Email - August 9, 2023 (Shawndale to Madiou)

- **Exhibit R: Email Communications**
- **Key Points:**
  - o Shawndale questioned the absence of preliminary hearings and raised concerns about the grand jury process and indictment validity.
  - o **Direct Quote:**

    "I would like to know how they got away with lawyers NOT being involved in the grand jury process. I would like for you to pull the grand jury information."
- **Importance:**

  Shawndale's inquiries into procedural safeguards were ignored, demonstrating Madiou's neglect of key defense strategies.

## 11. Email - August 9, 2023 (Later in the Day)

- **Exhibit R: Email Communications**
- **Key Points:**
  - o Shawndale emphasized the critical importance of her videos as exculpatory evidence, referencing the Brady Rule regarding criminal intent (mens rea).
  - o **Direct Quote:**

    "My videos provide exculpatory evidence as to mens rea and without criminal intent there is no crime. Brady Rule correct?"

- **Importance:**

  Despite repeated emphasis on the exculpatory nature of the evidence, Madiou's failure to
  act or submit the videos demonstrates ineffective legal representation and disregard for
  Brady v. Maryland.

## XVI. Ineffective Counsel Acting Under a Non-Existent Protective Order

Throughout these communications, Shawndale Chilcoat repeatedly urged her attorneys to address
exculpatory evidence and procedural violations. However, her attorneys failed to act, often citing
a protective order that was not legally in effect, further underscoring ineffective assistance of
counsel.

### 12. August 2023 – Phone Call with Maria Jacob Regarding Protective Order, Indictment, and Jurisdiction (See Exhibit U)

- **Acknowledgment of Missing Signatures and Stamps**

  - **Key Issue:** Maria Jacob admitted that key legal documents, including the
    indictment, lacked essential signatures, court seals, and a "Filed by Clerk of Court"
    stamp.

  - **Jacob's Quote:** "I'm looking at it right now. I don't see a stamp... but it's signed."

  - **Procedural Violations:** These omissions violate Federal Rule of Criminal
    Procedure 4.1, governing warrant issuance, and Federal Rule of Criminal
    Procedure 6(c), requiring proper certification of indictments. Missing signatures,
    stamps, and filing seals raise serious concerns about the validity of the filings.

- **Defective Indictment Concerns**

- o **Indictment Issues:** Donald Chilcoat questioned the legitimacy of the indictment, noting missing signatures from both a government attorney and the jury foreperson, as well as the lack of a court seal and "Filed by Clerk of Court" stamp.

- o **Jacob's Quote:** "It has a signature, but it's hard to make out."

- o **Violation:** Missing signatures and certification violate Federal Rule of Criminal Procedure 6(c), undermining the indictment's legal validity.

- **Admission of No Signed Protective Order**

  - o **Key Issue:** Jacob admitted no protective order had been signed or filed, yet discovery had been restricted for over two years as though one were in place.

  - o **Significance:** This restriction without a valid order violates *Brady v. Maryland*, 373 U.S. 83 (1963), which guarantees the defendant's right to access exculpatory evidence. Jacob's failure to rectify this situation further violated the Defendants' due process rights.

## 13. Moving Toward Trial Without Discovery

Despite knowing no protective order was in place, Maria Jacob continued preparing for trial without providing Donald Chilcoat access to essential discovery materials, impeding his ability to build a defense.

- **Jacob's Quote:** "We're going to be filing some substantive motions... motions to dismiss and potentially a motion to suppress..."

- **Issue:** Withholding crucial discovery violated Federal Rule of Criminal Procedure 16, which governs evidence disclosure to the defense. Jacob's inaction demonstrates

ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984), as it resulted in substantial prejudice to Donald's defense.

**Key Legal Support**

- **Federal Rules of Civil and Criminal Procedure:**

  - **Federal Rule of Criminal Procedure 4.1 and 6(c):** Require proper signatures and seals on warrants and indictments, both of which were missing in this case, questioning the validity of key legal filings.

- **Brady v. Maryland, 373 U.S. 83 (1963):** The failure to disclose exculpatory evidence, particularly in the absence of a protective order, violates the defendants' due process rights, further supporting claims of prosecutorial misconduct.

- **Strickland v. Washington, 466 U.S. 668 (1984):** Jacob's failure to address procedural defects, secure discovery, and advocate effectively for Donald constitutes ineffective assistance of counsel, severely prejudicing the defense's case.

Phone Call with Attorney Joseph McBride and Brad Geyer, Attorneys were informed in MAY 2024 that a protective order did not exist on the case (**Exhibit V**)

August 2023 – Phone Call with Attorney Joseph McBride Regarding Defense Strategy (**Exhibit W**)

Disagreement Over Strategy and Ignoring the Exculpatory Evidence

- **Key Issue**: Shawndale wanted to fight the charges, emphasizing the importance of reviewing video evidence she believed would prove their innocence. McBride pushed for a plea deal, arguing it was the best way to avoid a lengthy prison sentence.

- **Shawndale's Quote**: "You haven't even looked at our videos and your filing motions...

- **Key Issue**: Shawndale insisted on filing motions and using video evidence showing government misconduct, but McBride dismissed these efforts, focusing solely on plea negotiations.

- **Shawndale's Quote**: "Why are we not filing motions on this? What about the video evidence?"

**Summary**: Shawndale wanted to fight using key evidence, while McBride pushed for a plea deal and dismissed her strategy and her evidence.

**Exhibit XV: September 2024 - Communications with Defense Attorneys McBride and Geyer**

1. **Email: September 4, 2024 (Shawndale Chilcoat to Brad Geyer)**

   o **Key Points**: Shawndale forwarded documents regarding defective warrants and failure-to-appear notices, urging Geyer to take immediate legal action.

   o **Direct Quote**:

   "Please find the attachments regarding the defective warrants and notice how they are unsigned and unsealed. These need to be addressed immediately."

   o **Importance**: Shawndale's repeated attempts to address procedural defects were met with inaction, highlighting ineffective assistance of counsel. These procedural issues directly affect the legitimacy of the proceedings.

2. **Email: September 5, 2024 (Shawndale Chilcoat to Brad Geyer)**

   o **Key Points**: Shawndale reiterated her concerns regarding the defective warrants and expressed frustration over the lack of response.

   o **Direct Quote**:

"I am still waiting on a response regarding the defective warrants. We have repeatedly discussed this, and no action has been taken."

- o **Importance**: Shawndale's persistence in attempting to address critical procedural issues, and Geyer's continued inaction, demonstrate a failure to represent her interests effectively.

3. **Email: September 8, 2024 (Shawndale Chilcoat to Joseph McBride and Brad Geyer)**
   - o **Key Points**: Shawndale uploaded exculpatory videos, asking her attorneys to review the footage and submit it as evidence in court.
   - o **Direct Quote**:

"Please review the attached videos and ensure they are entered into the court record. These provide clear exculpatory evidence that we did not obstruct anything during the Capitol events."

- o **Importance**: Despite receiving exculpatory evidence, McBride and Geyer failed to review or present the videos in court, further demonstrating ineffective assistance of counsel.

4. **Text Message: September 9, 2024 (Shawndale Chilcoat to Brad Geyer)**
   - o **Key Points**: Shawndale sent a text message reminding Geyer about the defective warrants and exculpatory video evidence.
   - o **Direct Quote**:

"Brad, any updates on the warrants and the video evidence? These are critical for our defense, and I haven't heard back."

- o **Importance**: Shawndale's diligence in ensuring the defense was adequately prepared contrasts with Geyer's lack of communication and action, reinforcing claims of ineffective counsel.

5. **Email: September 10, 2024 (Shawndale Chilcoat to Joseph McBride)**

   o **Key Points**: Shawndale expressed frustration over McBride's failure to address the defective indictment and the lack of discovery, criticizing his focus on pushing a plea deal.

   o **Direct Quote**:

   "Joe, we have discussed the defective indictment and the missing discovery for months now. Why are these issues not being addressed? All I see is pressure to take a plea deal."

   o **Importance**: McBride's neglect in challenging procedural defects or securing discovery materials, while pressuring Shawndale into accepting a plea deal, exemplifies ineffective assistance of counsel. His failure to address critical legal and evidentiary issues compromises the defense's position.

## 6. Phone Call with Attorney Joseph McBride Regarding Defense Strategy – September 2024 (Exhibit Y)

**No Protective Order in Place**:

- McBride clearly states during the conversation that no one had signed a protective order in your case, and that the judge had explicitly told you in court that there was no protective order.  McBride does not tell Shawndale the attachment A was removed from the protective order and that her signature was not longer required and continued to push for her to view discovery, this would have tied her to the protective orders terms.

**Conclusion**

The breakdown in communication between the Chilcoats and their defense team, combined with persistent pressure to accept a plea deal and a lack of action on key procedural defects, highlights ineffective assistance of counsel. These failures directly impacted the Defendants' ability to

prepare a strong defense and access essential evidence. The attorneys' neglect to address defective warrants, the indictment, and discovery materials, while focusing on plea negotiations, reflects a disregard for the Defendants' legal rights and interests.

## September 12, 2024 – In-Person Hearing in Washington, D.C.

During the September 12, 2024, hearing, Shawndale Chilcoat sought clarification regarding the protective order's status. The judge opened the hearing by confirming that no protective order was in place, having checked the docket. DOJ prosecutor Ashley Akers supported this, attributing the absence of the protective order to an oversight.

However, defense attorneys revealed that they had assumed a protective order was in effect because it was common in other January 6 cases. This explanation conflicted with information from a May 2024 phone call (**Exhibit V**), where the attorneys were explicitly informed that no protective order had been signed. This inconsistency highlighted a significant failure by the defense team to grasp the procedural history of the case.

### A. Government Admissions Regarding Discovery

During the hearing, government attorney Ashley Akers admitted that there was no valid reason for the two-year delay in providing discovery to the defendants. Akers stated that discovery had been available to defense counsel as early as December 9, 2022. However, this contradicts a prior email Akers sent to defense attorney Stephen Kirsch on September 22, 2022, where she explicitly stated that discovery could not be provided without a protective order in place.

This contradiction implies either a miscommunication or deliberate effort to delay the case by falsely claiming that discovery could not be shared without a protective order. It raises questions of misconduct or mismanagement, both from the government and defense attorneys.

## A. Implications of the Discovery and Protective Order Issues

The handling of discovery and the protective order points to a concerning pattern of mismanagement and misconduct by the defense counsel over the past two years. Defense attorneys either colluded with the government or misled their clients by pretending a protective order existed, effectively withholding discovery. They also failed to challenge the absence of a signed protective order, a critical issue that severely hindered Shawndale and Donald Chilcoat's ability to prepare their defense.

Akers' statement during the hearing further revealed that defense counsel had access to discovery since December 9, 2022. However, none of the attorneys—Jacob, Lawler, Madiou, McBride, or Geyer—explained to the defendants that although discovery was available, they could not review it without signing a protective order. Instead of focusing on this critical issue, the attorneys primarily pushed the defendants to accept a plea deal.

This conduct suggests two possible scenarios:

1. The attorneys intended to pressure the defendants into accepting a plea deal without them ever reviewing the evidence against them, which would have resulted in uninformed consent.

2. The defense counsel planned to proceed to trial without allowing their clients to review crucial discovery materials, further denying the defendants a proper opportunity to build their defense.

Both scenarios represent grave violations of the defendants' constitutional rights and due process protections. The failure to address the discovery and protective order issues significantly impaired Shawndale and Donald's ability to challenge the charges against them, casting serious doubt on the fairness of the proceedings.

## B. Consequences and Pushback of Trial Dates

By July 2024, Shawndale Chilcoat began filing pro se motions after realizing her legal counsel—including McBride, Geyer, and earlier defense teams—had failed to address critical issues. These issues included the defective indictment, flawed warrants, excessive force, and illegal extradition. Despite these being fundamental legal concerns, none of her attorneys filed motions to challenge the 18 U.S.C. § 1512(c)(2) charge, nor did they tackle the ongoing discovery problems Shawndale and Donald Chilcoat faced throughout the proceedings.

After formally dismissing McBride, Geyer, and the rest of her defense team, Shawndale anticipated that her pro se motions would finally be considered. However, the court imposed a limitation, requiring her to file just one comprehensive motion addressing all her concerns. This restriction is deeply unfair, given the number of unresolved issues that had accumulated due to her attorneys' negligence. These should have been handled by her defense long before she was forced to proceed pro se.

The court's refusal to allow Shawndale to file multiple motions, and the imposition of a single motion requirement, places an unreasonable burden on her. Especially considering the failures of her previous attorneys to file standard motions, such as those challenging the legality of the indictment and the § 1512 charge, this approach effectively punishes Shawndale for her legal team's incompetence.

It should be clear to the court that the attorneys consistently failed to meet basic legal standards in defending Shawndale. Restricting her to a single motion ignores the depth and breadth of the issues that have hindered her defense from the beginning, further compounding the injustice in this case.

### C. Improper Service, Attorney Collusion, and Jurisdictional Challenge

The defendants assert that the Department of Justice (DOJ), in collusion with defense counsel, failed to comply with the Federal Rules of Criminal Procedure regarding the proper service of the indictment and court notices. Specifically, the DOJ improperly relied on email service through the defendants' attorneys rather than directly serving the defendants in compliance with **Federal Rule of Criminal Procedure 4(c)(1)** and **Rule 9(a)**. Rule 4(c)(1) requires service to be carried out by a United States marshal or authorized officer, and Rule 9(a) governs the issuance and service of warrants or summonses after the return of an indictment. This failure to properly serve the defendants invalidates the court's jurisdiction.

### D. Improper Service by Unauthorized Parties

The service of legal documents, including indictments, by unauthorized individuals, such as attorneys, violates established service rules. According to **Ohio Rule of Civil Procedure 4.3**, service must be performed by an authorized officer, either through certified mail or personal

delivery, not email. In this case, the attorneys—aware that they were not authorized process servers—participated in improper service, violating both federal and Ohio procedural rules.

Additionally, the court's use of FedEx to serve court orders violates **Ohio Rule 4.3**, which mandates that out-of-state service be conducted via **USPS Certified Mail** or **USPS Express Mail**, as these methods are federally regulated. The use of a private carrier like FedEx further invalidates the service, raising serious questions about the court's jurisdiction.

### E. Violations of Constitutional and Procedural Rights

The improper service of the indictment and court notices infringes upon the defendants' Sixth Amendment rights, which guarantee the right to be informed of the nature of the accusations. The use of email and unauthorized service methods deprived the defendants of proper notice, violating due process protections under *Mullane v. Central Hanover Bank & Trust Co.*, **339 U.S. 306 (1950)**.

Moreover, the DOJ's actions, along with the defense attorneys' involvement, suggest collusion to bypass proper legal procedures. The protective order—which was never signed or agreed to by the defendants—appears to have been used to justify these procedural failures, further infringing upon their rights under *Brady v. Maryland*, **373 U.S. 83 (1963)**, which guarantees access to exculpatory evidence.

### F. Jurisdictional Implications

The court's failure to properly serve the defendants deprives it of jurisdiction, as outlined in **, 282 U.S. 270 (1931)**, which holds that failure to follow proper service procedures constitutes a due process violation and voids the court's authority. Similarly, in *United States v. Green*, **305 F.3d**

**422 (6th Cir. 2002)**, the court held that improper service by unauthorized individuals invalidates jurisdiction, a principle that applies here due to the DOJ's reliance on email service by attorneys.

The defendants also highlight that the indictment they received was defective, lacking essential signatures, seals, and stamps, which further undermines the court's jurisdiction under **Federal Rule of Criminal Procedure 6(c)**.

**Conclusion**

The improper service of the indictment and court notices, conducted by unauthorized attorneys via email, and the use of FedEx for court orders, directly violate both federal and Ohio procedural rules. These violations deprive the court of jurisdiction and infringe upon the defendants' constitutional rights. The defendants request that the court dismiss the indictment and void all related proceedings due to the DOJ's failure to establish jurisdiction through proper service.

Furthermore, the government's continuous failure to adhere to procedural standards, along with ongoing constitutional violations, justifies dismissal of the case with prejudice. The defendants' rights under the Fourth, Fifth, Sixth, Eighth, Thirteenth, and Fourteenth Amendments have been violated through improper searches, denial of due process, ineffective counsel, and excessive pretrial conditions.

## XVI. Argument Challenging DOJ Standing: Absence of Victim, Monetary Loss, and Remedy for Relief

The charges against the Defendants should also be dismissed due to the **Department of Justice's (DOJ) lack of standing** to bring this case. **Standing** requires the government to demonstrate that it is addressing a **concrete injury**, typically tied to an identifiable victim or measurable financial

harm, and that the relief sought by the government is necessary to remedy that injury. The **Supreme Court** in ***Lujan v. Defenders of Wildlife*,** 504 U.S. 555 (1992), laid out the three-part requirement for standing: (1) injury-in-fact, (2) causation, and (3) redressability.

### A. No Victim or Concrete Injury Identified

The DOJ has failed to identify any **victim** or **concrete injury** resulting from the Defendants' actions. Unlike criminal cases involving fraud, violence, or property damage, where there is a clear victim or injured party, this case presents no such foundation for legal action. The absence of a specific and identifiable victim calls into question the necessity and propriety of these proceedings. Without a harmed party, the government lacks any basis for redress, as required under **Article III standing**. This significantly weakens the DOJ's claim and the legitimacy of the prosecution.

### B. No Monetary Loss or Financial Harm

Furthermore, the DOJ has provided no evidence of **monetary loss** or **financial harm** caused by the Defendants' conduct. Courts have long held that standing requires some form of economic injury or detriment that the government is seeking to remedy. In ***Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)**, the Supreme Court made clear that standing necessitates a tangible harm—something absent in this case. Without showing financial or economic injury, the government cannot satisfy the standing requirement of **injury-in-fact**, which is fundamental to maintaining this prosecution.

### C. No Remedy or Relief Sought

In addition, the DOJ has not articulated any **remedy** or **relief** for the alleged offenses. Criminal cases typically involve remedies such as restitution for victims, penalties for harm prevention, or

public safety measures. Here, the government has not identified any harm requiring redress, nor has it proposed any form of relief. This absence of a remedy means that the DOJ's pursuit of this case does not serve any valid purpose. **Redressability** is a critical component of standing, as emphasized in *Spokeo, Inc. v. Robins*, **136 S. Ct. 1540 (2016)**, where the Court ruled that without a remedy to address the alleged harm, standing is not established.

### D. Lack of Standing Bars Prosecution

Given the failure to demonstrate a concrete injury, the absence of any victim or financial harm, and the lack of a proposed remedy, the DOJ does not have standing to prosecute this case. *Steel Co. v. Citizens for a Better Environment*, **523 U.S. 83 (1998)**, reaffirmed that standing is a prerequisite for any legal action, and where standing is absent, the court must dismiss the case. Without proper standing, the charges against the Defendants are void, and the court lacks jurisdiction over this case.

### E. DOJ's Standing Deficiency and Procedural Failures

In the absence of concrete injury, identifiable victims, or a clear remedy for relief, the DOJ's prosecution of the Defendants fails to meet the legal requirements for standing under **Article III**. Moreover, the improper service, defective filings, and ongoing constitutional violations further demonstrate the lack of a valid basis for this case. Consequently, the charges should be dismissed due to the DOJ's lack of standing and procedural failures.

## XVII. Procedural Violations: Protective Orders and Discovery Restrictions

In addition to the invalidity of the charges under § 1512(c)(2), the Defendants have been subjected to overly restrictive protective orders that hinder their ability to access exculpatory

evidence. This violates the principles established in ***Brady v. Maryland*, 373 U.S. 83 (1963)**, which guarantees the defendant's right to access material evidence that could exonerate them.

1. **Violation of Brady**:
   - The government has imposed discovery restrictions that prevent the Defendants from fully accessing and using their own recordings and evidence from January 6, 2021, in their defense. These restrictions, imposed under the guise of protective orders, lack the necessary judicial oversight and justification, further prejudicing the Defendants' ability to defend against the charges.

2. **Overreach in Protective Orders**:
   - In light of the **Loper Bright** ruling limiting executive overreach, the use of such protective orders should be reconsidered, as they further violate the Defendants' constitutional rights. The Court must ensure that these procedural measures align with the strict statutory limits defined by the Supreme Court.

## XVIII. Conclusion: Dismissal of 18 U.S.C. § 1512(c)(2) Charges

The combined impact of the Supreme Court's decisions in **Fischer v. United States** and **Loper Bright Enterprises v. Raimondo** places significant judicial scrutiny on the DOJ's actions in this case. The Defendants have not been accused of tampering with or destroying evidence, and thus, the charges under § 1512(c)(2) are legally baseless. Moreover, the DOJ's expansive interpretation of the statute conflicts with the judicial principles outlined in **Loper Bright**, which require courts to interpret ambiguous laws without deferring to the government's overreach.

The Defendants respectfully request that the Court dismiss the charges under § 1512(c)(2) and reconsider the restrictive protective orders that have unfairly limited their access to exculpatory

evidence. The law is clear, and the Supreme Court has spoken. This Court has a duty to uphold these precedents and ensure that justice is done by dismissing the charges against the Defendants.

## Argument for Dismissal Based on Supreme Court Precedent: *Fischer v. United States* and *Loper Bright Enterprises v. Raimondo*

The Defendants in this case respectfully request that the charges brought under **18 U.S.C. § 1512(c)(2)** be dismissed based on binding Supreme Court precedent, specifically the rulings in *Fischer v. United States* (**EXHIBIT Z**) and *Loper Bright Enterprises v. Raimondo*. Both cases significantly narrow the scope of the statute under which the Defendants have been charged and limit the government's authority to pursue overbroad interpretations of criminal statutes. The continued prosecution of the Defendants under **18 U.S.C. § 1512(c)(2),** despite these rulings, violates established constitutional principles and represents an abuse of prosecutorial discretion.

## I. Fischer v. United States: Limitation of § 1512(c)(2)

In *Fischer v. United States*, the Supreme Court explicitly narrowed the scope of **18 U.S.C. § 1512(c)(2)** to apply only to conduct that impairs the availability or integrity of evidence in an official proceeding. The Court held that the statute is primarily concerned with evidence tampering or obstruction related directly to the production or presentation of evidence. As such, general actions that do not involve the manipulation or destruction of evidence fall outside the statute's reach.

1. **Invalidity of § 1512(c)(2) Charge Against Defendants**:
   - The indictment against the Defendants does not allege any actions that involve the tampering, destruction, or manipulation of evidence. The Defendants are accused

of actions that are unrelated to the specific concerns of § 1512(c)(2) as outlined by the Supreme Court.

o   Under the **Fischer** decision, the charges brought under § 1512(c)(2) are legally baseless because there is no accusation of evidence tampering or obstruction in the form of impairing the integrity of evidence during an official proceeding.

2. **Supreme Court Binding Precedent**:

o   As per ***Cooper v. Aaron*, 358 U.S. 1 (1958)**, the decisions of the U.S. Supreme Court are the "supreme law of the land," and all lower courts, including this District Court, are bound to apply the rulings. The Supreme Court's holding in **Fischer** is clear: § 1512(c)(2) is limited in scope. To continue prosecuting the Defendants under this statute would be a direct violation of the precedent established by the highest court in the United States.

3. **Judicial Duty to Dismiss**:

o   The Defendants urge the Court to recognize its obligation under ***Hutto v. Davis*, 454 U.S. 370 (1982)** and ***Rodriguez de Quijas v. Shearson*/American Express, Inc., 490 U.S. 477 (1989)** to follow binding Supreme Court precedent, even if the Court disagrees with or believes there is ambiguity in the ruling. The plain language of **Fischer** makes it clear that without allegations of evidence tampering, the charges under § 1512(c)(2) are invalid and must be dismissed.

## XIX. Loper Bright Enterprises v. Raimondo: Limiting DOJ Overreach and Chevron Deference

In ***Loper Bright Enterprises v. Raimondo***, the Supreme Court overturned the longstanding principle of **Chevron deference**, which had allowed courts to defer to administrative agencies

when interpreting ambiguous statutes. The Court ruled that in the absence of clear statutory language, it is the duty of the judiciary—not executive agencies or the Department of Justice (DOJ)—to interpret the law. This ruling is particularly relevant to the DOJ's actions in this case.

1. **Chevron Deference Overturned and Its Impact**:

   o The Supreme Court's decision in **Loper Bright** unequivocally establishes that courts must resolve statutory ambiguities themselves, without deferring to the government's interpretation. This ruling limits the DOJ's ability to prosecute cases based on overly broad or creative interpretations of statutes, particularly where the language is clear.

   o In the context of **18 U.S.C. § 1512(c)(2)**, the government can no longer rely on a broad or expansive reading of the statute that goes beyond its intended scope. The DOJ's continued pursuit of charges under § 1512(c)(2) violates the principles established in **Loper Bright** by attempting to expand the statute beyond the clear limits set by the Supreme Court in **Fischer**.

2. **Relevance to This Case**:

   o The Defendants argue that the DOJ's pursuit of charges under § 1512(c)(2) is an example of prosecutorial overreach that is precisely what **Loper Bright** sought to prevent. The statute was designed to address evidence tampering, not general obstruction unrelated to the integrity of evidence. The government's expansive interpretation must be rejected, and the charges dismissed.

3. **Judicial Duty Post-Loper Bright**:

   o Following the ruling in **Loper Bright**, this Court has a duty to independently assess the statute's meaning and not defer to the DOJ's interpretation. The

Supreme Court's decision makes it clear that § 1512(c)(2) cannot be applied to the Defendants' conduct unless it directly involves evidence tampering. As no such allegations have been made, the statute cannot support the charges in this case.

**Conclusion**

In light of the overwhelming evidence of government misconduct, procedural violations, and the Defendants' lack of criminal intent, this case fails to meet the constitutional standards required for criminal prosecution. The Defendants acted in good faith, under the belief that they were lawfully exercising their First Amendment rights, and were entrapped by government actors into conduct they would not have otherwise engaged in. Furthermore, the government's improper use of protective orders to conceal exculpatory evidence, combined with defective warrants, improper service, and the denial of due process, has irreparably tainted the prosecution's case.

The failure of defense counsel to address these critical procedural issues only compounds the injustice suffered by the Defendants. They have been denied access to key evidence, misled by their own legal representatives, and subjected to an unlawful extradition process. The culmination of these factors has resulted in the deprivation of the Defendants' constitutional rights under the Fourth, Fifth, and Sixth Amendments.

Therefore, the Defendants respectfully request the Court to:

1. **Dismiss all charges with prejudice**, as the prosecution has failed to establish criminal intent, and the entrapment defense is fully supported by the evidence presented, including procedural misconduct by the government.

2. **Lift all pretrial conditions**, including home detention and electronic monitoring, which have been unjustly imposed for over two years without any valid legal basis or adherence to proper judicial procedures.

3. **Order immediate and unrestricted access to all discovery materials** that have been wrongfully withheld under the guise of an invalid protective order. The continued withholding of critical exculpatory evidence violates the Defendants' constitutional right to a fair trial and due process.

4. **Compel the government to produce certified copies of all relevant documents**, including arrest warrants, search warrants, and the indictment, properly signed, sealed, and filed in accordance with the law, as required under **28 U.S.C. § 1691** and **Federal Rule of Criminal Procedure 4(c)(1)**. These documents must be produced in certified form to ensure their authenticity and compliance with both federal and state laws.

5. **Acknowledge the government's procedural misconduct** and consider the possibility of **judicial and military review under the Military Justice Act and Title 10 U.S.C. Chapter 322**, given the initial invocation of national security concerns and the unresolved issues related to the government's strategic shift in justification. The government's attempt to avoid military oversight and judicial review, particularly in light of the mishandling of national security claims, requires further scrutiny. Additionally, the involvement of sensitive materials related to the Presidential Records may invoke **42 U.S.C. § 2201**, which governs the handling, storage, and accessibility of records and information related to presidential duties, potentially subjecting the government's actions to higher standards of oversight and disclosure.

**Conclusion of Memorandum**

For all the foregoing reasons, the Defendants request that the Court grant their motions to dismiss, lift the pretrial conditions, and order immediate disclosure of all discovery materials. Additionally, the Defendants ask the Court to assess the government's shifting justifications and determine whether military oversight is necessary for a full and fair review of the government's actions. The Defendants further request that the Court scrutinize the government's procedural conduct and hold accountable any violations of the Defendants' constitutional rights.

Respectfully submitted,

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**,

Plaintiff,

v.

**SHAWNDALE CHILCOAT** and **DONALD CHILCOAT**, Pro Se,

Defendants.

Case No.: 22-cr-299CKK and/or 1:22-00299CKK

Judge: **Colleen Kollar-Kotelly**

**EXHIBIT LIST**:

1. **Exhibit A**: Jacob Chansley encouraging people to enter the Capitol with several Capitol officers standing around him in a protective stance.

2. **Exhibit B**: Chamber video showing an officer in the middle of the room during the Capitol entry, where Jacob Chansley and others who were wearing Trump-supporting attire.

3. **Exhibit B1**: Trump's Proclamation to Disburse.

4. **Exhibit C**: Tore Maras Affidavit, outlining election-related issues.

5. **Exhibit D**: Halderman Report on voting systems vulnerabilities.

6. **Exhibit E**: FBI whistleblower testimony, highlighting government misconduct.

7. **Exhibit E1**: FBI denied FOIA request.

8. **Exhibit F**: Michael Horowitz DOJ OIG testimony/report.

9. **Exhibit F1**: FBI SWAT videos from the raid on October 11, 2023.

10. **Exhibit G**: Judge Clay's orders stating he does not have jurisdiction.

11. **Exhibit H**: Arrest warrant for Failure to Appear (October 11, 2023).

12. **Exhibit H1**: Order asserting jurisdiction (example of improper court service, lacking clerk stamp and seal).

13. **Exhibit H2**: Example of all FedEx envelopes from court orders sent without proper stamps.

14. **Exhibit I**: DNA Warrant for Donald Chilcoat (October 11, 2023).

15. **Exhibit I1**: Judge Polster's order converted (Habeas Corpus).

16. **Exhibit J**: Arrest warrant for Shawndale Chilcoat (August 11, 2022).

17. **Exhibit J1**: Judge Polster's Habeas Corpus decision.

18. **Exhibit K**: Arrest warrant for Donald Chilcoat (August 11, 2022).

19. **Exhibit L**: Search and seizure warrant for electronics (August 11, 2022).

20. **Exhibit M**: Search and seizure warrant for firearms (August 11, 2022).

21. **Exhibit N**: Indictment, unnamed, unsigned, unstamped, unsealed.

22. **Exhibit O**: Indictments served by out-of-state attorneys via email.

23. **Exhibit P**: Jacob's audio call from December 8, 2022, enforcing a non-existent protective order.

24. **Exhibit Q**: Jacob explaining the need to sign the protective order for discovery access and offering to sign it for Donald Chilcoat.

25. **Exhibit R**: Steven Kiersh and Ashley Akers email exchange discussing the need for Shawndale's signature on the protective order before discovery could proceed.

26. **Exhibit S**: July 28, 2023, Jacob's audio enforcing the non-existent protective order.

27. **Exhibit T**: Emails to defense attorney Nicholas Madiou in August of 2023 regarding protective orders.

28. **Exhibit U**: August 2023, Maria Jacobs explaining the protective order was never signed by the judge.

29. **Exhibit V**: Audio from May 2024 proving attorneys knew by May 9, 2024, that there was no protective order on the case.

30. **Exhibit W**: Joseph McBride phone call regarding defense strategy, where he expressed frustration over Shawndale filing motions.

31. **Exhibit X**: Email and text communications between McBride and Geyer.

32. **Exhibit Y**: Audio call with McBride stating there was no protective order on the case.

33. **Exhibit Z**: Supreme Court decision on 18 U.S.C. § 1512 (Fischer case).

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA**,

Plaintiff,

v.

**SHAWNDALE CHILCOAT** and **DONALD CHILCOAT**, Pro Se,

Defendants.

**Case No.:** 22-cr-299CKK and/or 1:22-00299CKK

**Judge:** Colleen Kollar-Kotelly

# CERTIFICATE OF SERVICE

We, Shawndale Chilcoat and Donald Chilcoat, hereby certify that on October 18, 2024, a true and correct copy of the Defendants' **Motion to Dismiss or, in the Alternative, for Judicial and Military Review**, along with the **Memorandum in Support**, was served via electronic mail to the following parties:

1. **U.S. District Court for the District of Columbia**

   Email: dcd_intake@dcd.uscourts.gov

2. **U.S. Department of Justice**

   Email: USADC.ServiceCivil@usdoj.gov

   Email: Ashley.Akers@usdoj.gov

We certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**Respectfully Submitted,**



Shawndale Chilcoat, Pro Se

_____

Donald Chilcoat, Pro Se